COMPTON v. JESUP et al.

(Circuit Court of Appeals, Sixth Circuit. April 2, 1895.)

No. 84.

1. UNITED STATES COURTS—JURISDICTION—ANCILLARY SUIT.

A suit was brought in a federal court to foreclose one of several mortgages to which the W. railway system and its component parts were subject. The road was sold under decree of foreclosure, but the court did not order it turned over to the purchasers by the receivers who had been in possession. While the road was still in the possession of the receivers, the mortgagees under a prior mortgage commenced a suit in the same federal court to foreclose their mortgage, to which suit numerous persons having interests in or claims upon the road were made parties, and filed answers and cross bills, citizens of the same states appearing upon both sides of the controversy. *Held*, that the federal court which had possession of the property had inherent, ancillary jurisdiction to entertain the suit, because of such possession, without regard to the citizenship of the parties.

2. SAME—ANCILLARY AND COLLATERAL SUITS.

*Held*, further, that the new foreclosure suit, while dependent on and ancillary to the original suit in which possession had been taken, was so far collateral to it as to prevent an examination of the correctness of the orders and decrees made in it.

3. FEDERAL AND STATE COURTS—JURISDICTION—POSSESSION OF RES.

*Held*, further, that no objection to the possession of the court in the original suit could be sustained on the ground that when such possession was taken a suit was pending in a state court in the nature of a proceeding in rem against the property, actual possession of the property not having been taken in such suit in the state court.

4. PARTIES—ANCILLARY SUITS—DIVERSE CITIZENSHIP.

*Held*, further, that in such dependent or ancillary suit the court had power to bring in, by compulsory process, any person claiming an interest in the property, whose presence was necessary to the relief sought by the complainants, although such person did not himself seek the establishment of his interest in the suit, and his citizenship was such that it would defeat the jurisdiction if it depended on diverse citizenship.

5. JUDGMENT—RES ADJUDICATA—CLASS SUIT.

One of the holders of a class of securities brought a suit in a federal court in Indiana to establish such securities as a lien on certain property, for the benefit of such of the security holders as should come in and contribute to the expenses of the suit. The relief sought was denied by a final decree, after appeal to the supreme court. Pending this suit, one C.,

a holder of the securities, but who had never taken part in or contributed to the Indiana suit, brought suit in a state court in Ohio for the same relief. Neither the pendency of the Indiana suit, nor the decree of the supreme court, was ever set up in the Ohio suit, in which a decree was made granting C. the relief sought. *Held*, that the Indiana decree did not bind C., nor estop him to set up afterwards the decree in his favor in the Ohio suit.

6. RAILROADS—MORTGAGE OF AFTER-ACQUIRED PROPERTY—OHIO STATUTES.

An Ohio railway corporation has power to mortgage its railroad, and any subsequent accessions or accretions properly appurtenant thereto, acquired either by itself or by any successor in title, whether the road be then maintained and the property acquired by virtue of the original franchise, or of similar franchises granted by the same sovereign.

7. RAILROAD FORECLOSURE—DECREE OF SALE—EFFECT OF SAVING CLAUSE.

The T. Ry. Co., of Ohio, and the W. Ry. Co., of Indiana, which had each issued two mortgages on their respective roads, the trustees in which were the same for both roads, were consolidated into the T. & W. Ry. Co., which issued certain so-called "equipment bonds." The T. & W. Ry. Co. was afterwards consolidated with other railroads, under an agreement, forming the T., W. & W. Ry. Co.; the effect of such agreement, and of the statutes under which the consolidation was made, being to fix upon the property of the T. & W. Ry. Co. a lien in favor of its creditors, including the holders of the equipment bonds. The T., W. & W. Ry. Co. made a mortgage to K. and J., trustees, to secure an issue of bonds. Subsequently other consolidations took place, and several other mortgages and series of bonds were issued. A suit was brought to foreclose a mortgage subsequent to the K. and J. mortgage, and the road was sold; but, before its delivery by the court to the purchaser, suits were brought by K. and J. in the various districts in which the road was situated, to which the trustees of all the mortgages, including the underlying first mortgages on the Ohio and Indiana Divisions, were made parties, and a decree was sought for a sale of the whole road, free from all liens. The suits in the several districts proceeded pari passu, and an identical decree was entered in all, directing the sale of the road. One C., a holder of equipment bonds issued by the T. & W. Ry. Co., had brought a suit in a state court in Ohio, before the institution of the K. and J. suit, making parties the T., W. & W. Ry. Co. and others, including all the corporations which succeeded to the ownership of the road after the T., W. & W. Ry. Co., and the mortgagees in mortgages subsequent to the consolidation, which created the lien of the equipment bonds, but not including the mortgagees in the underlying divisional mortgages on the Ohio and Indiana Lines; and in such suit a decree had been made by the Ohio court establishing C.'s lien on the property of the T. & W. Ry. Co., including the Ohio and Indiana Lines, and directing a sale of the Ohio Line, subject to the underlying divisional mortgages, to satisfy such lien. This decree was not executed, owing to the possession of the road by the federal court in the K. and J. suit. C. was made a party to the K. and J. suit, and the court was asked to enjoin him from asserting his lien under the Ohio decree. At the time of the decree of sale in the K. and J. suit, objections made by C. to the jurisdiction of the court had just been overruled, and he had been required to answer. A provision was inserted in the decree of sale, at C.'s request, reciting his objection and exception to its entry, and adjudging that the sale should be upon condition that if C.'s lien should be upheld the purchaser at the sale should pay him the amount due him, or, in default thereof, the court should resume possession of the property, and enforce its decree, by resale or otherwise, as it might direct; that C.'s lien, notwithstanding the sale, should proceed to a decree binding the purchaser, it being the intention to preserve the rights of C. in the relation in which he stood at the time of the decree towards the mortgagees, parties to the suit. *Held*, that such saving clause did not give to C., upon a decree establishing his lien, a right to an absolute decree for its payment by the purchaser of the road, but only to such relief as he would have been entitled to if not made a party to

the suit; his lien being, at all events, subject to the underlying mortgages on the railroads which were consolidated to form the T. & W. Ry. Co.

8. SAME—RELIEF OF UNFORECLOSED LIENOR.

*Held,* further, that as C.'s Ohio suit had not been brought for the benefit of others entitled to the same lien, and such others would be equally entitled with C. to enforce it, it would be inequitable, as against the holders of the prior divisional mortgages, to order a resale of the Ohio Division free from such mortgages, even if such a proceeding were authorized by the statutes and decisions of Ohio, and that the only remedy which C. could have was a redemption from the divisional mortgages prior to his lien.

9. JUDGMENT—RES ADJUDICATA.

*Held,* further, that the question whether or not C. had a right to a separate redemption of the Ohio Division should be certified to the supreme court.

10. MORTGAGES—REDEMPTION—NET EARNINGS OF PROPERTY.

*Held,* further, that the question whether or not, upon redemption, C. was entitled to have the amount of principal and interest of the mortgage debts reduced by the net earnings of the road or roads in the hands of the purchaser at the sale in the K. and J. suit, or his assignee, should be certified to the supreme court.

11. JUDGMENT—RES ADJUDICATA.

*Held,* further, that the question whether or not, upon an appeal from the decree rendered by the federal court in K. and J.'s Ohio suit, a decree rendered in the federal court in Indiana, in the ancillary suit of K. and J., upon the same questions, and not appealed from, was res adjudicata upon such questions, should be certified to the supreme court.

12. SAME.

It seems that, as against all parties to C.'s Ohio suit, the decree of the Ohio state court established conclusively that C. had a lien on the railroad of the T. & W. Ry. Co., which might be enforced against the Ohio Division alone, without regard to his remedies against the Indiana Division. Per Taft, Circuit Judge.

13. LIEN—REMEDIES.

It seems that, as against all parties to C.'s Ohio suit, he had the right to redeem the Ohio Division from the underlying mortgages without redeeming the Indiana Division, since such relief was incident to the relief by sale granted by the Ohio decree. Nor could the mortgagees in such mortgages object, since their debt would thereby be paid, and it was conclusively established by the Ohio decree that C. had an interest in the equity of redemption under their mortgages. Per Taft, Circuit Judge.

14. EQUITY—DECREE—RES ADJUDICATA.

It seems that the determination of the Ohio court that the Ohio Division only should be sold was equally res adjudicata with the determination as to the existence of the lien. Per Taft, Circuit Judge.

15. RAILROADS—CONSOLIDATION—EFFECT.

It seems that the lien impressed upon the property of the T. & W. Ry. Co. by its merger in the T., W. & W. Ry. Co. was a lien upon the separate equities of redemption owned by it in the property of the Indiana and Ohio Divisions, and that, as it might have redeemed separately, so might the lienor. Per Taft, Circuit Judge.

16. MORTGAGES—PARTIES—TRUSTEES.

It seems that the fact that the trustees in two several railway mortgages to secure bonds are the same does not make the mortgagees the same, in the absence of proof that the bondholders under the two mortgages are the same. Per Taft, Circuit Judge.

17. EQUITY PRACTICE—ANCILLARY SUITS—IDENTICAL DECREE.

It seems that the several suits instituted by K. and J. in the several districts in which the road lay were to be regarded as distinct, and the provisions of the identical decrees entered in such suits as separately applicable to the portions of the road within the several jurisdictions, and, accordingly, that the trustees of the divisional mortgages had no right, in

the suit in the Ohio district, to represent the interests of the Indiana mortgagees. Per Taft, Circuit Judge.

**18. SAME—DEFENSES NOT INTERPOSED.**

It seems that, even if the consolidation which fixed the lien of the equipment bonds on the property of the T. & W. Ry. Co. also fixed a lien on the Ohio Division in favor of the bonds issued under the Indiana mortgage, for which the T. & W. Ry. Co. was also liable, the trustees of the Indiana mortgage could not therefore object to a separate redemption of the Ohio Division by C., since they did not set up such lien, or seek foreclosure under it, in the K. and J. suit. Per Taft, Circuit Judge.

**19. COLIENORS—SEPARATE SECURITIES.**

It seems that the trustees of the Indiana mortgages, while themselves asserting the right to foreclose the Indiana Division, to the exclusion of C.'s right to resort to it, could not object to C.'s enforcing his lien upon the Ohio Division alone. Per Taft, Circuit Judge.

**20. MORTGAGES—MORTGAGEE IN POSSESSION.**

It seems that the assignee of the purchaser at the sale under the decree in the K. and J. suit, in which all the mortgages were foreclosed, should be regarded as mortgagee in possession under the divisional mortgages, and that C. was entitled to have the amount of principal and interest due upon the mortgages redeemed reduced by the amount of net earnings of the Ohio Division in the hands of such assignee. Per Taft, Circuit Judge.

**21. JUDGMENT—RES ADJUDICATA.**

It seems that a decree in the suit instituted by K. and J. in the federal court in Indiana, adjudging C. not entitled to appropriate the Indiana Division to the payment of his lien, though not appealed from, was not res adjudicata in the suit in the federal court in Ohio, as to his right to appropriate the Ohio Division. Per Taft, Circuit Judge.

**22. SAME.**

It seems that the determination of the Ohio state court that the Ohio Division only should be sold to satisfy C.'s lien was not an adjudication that C. had separable liens on the Indiana and Ohio Divisions, and did not make his right to separate sale or redemption res adjudicata. Per Lurton, Circuit Judge.

**23. SAME—EQUITY PRACTICE.**

C. having sought, after being made a party to the K. and J. suit, to have his Ohio decree, which had become ineffective through the seizure of the property by the federal court, enforced in the K. and J. suit, it seems that the doctrine of res adjudicata would not prevent the federal court from looking into the nature and character of the Ohio decree, and if found to be inequitable, under the circumstances, from refusing to award C. the remedy, by resort to the Ohio Division alone, which was awarded him by that decree. Per Lurton, Circuit Judge.

**24. LIENS—SEPARATE SECURITIES—REDEMPTION.**

It seems that as C. had not made parties the other holders of equipment bonds and creditors equally entitled with him to redeem, as he should have done for the protection of the mortgagees subsequent to this lien, it would be inequitable to permit him to complicate the situation further by a partial redemption of the property subject to such lien, leaving the Indiana Division still subject to redemption by him or other creditors. Per Lurton, Circuit Judge.

**25. SAME—RIGHTS OF SURETY.**

It seems that as upon the consolidation of the T. & W. Ry. Co., with others, in the T., W. & W. Ry. Co., the former became surety to the latter upon its undertaking, by agreement, and under the statutes authorizing the consolidation, to assume all the debts of the T. & W. Ry. Co., including all the divisional mortgages' as well as the equipment bonds, the T. & W. Ry. Co. had a right to object to the release of any part of the property primarily liable for such debts, and accordingly to a separate redemption of the Ohio Division by C., leaving the Indiana Division the sole security for the remaining debts, and that such objection could not

be avoided by C. on the ground that he had not made the T. & W. Ry. Co. a party to the suit. Per Lurton, Circuit Judge.

26. MORTGAGES—REDEMPTION—TACKING.

It seems that, the trustees of the Indiana and Ohio divisional mortgages being the same, the mortgagees were to be regarded as the same; and all such mortgages having also been assumed by the same party, the T., W. & W. Ry. Co., neither that company, nor C., who derived his rights under it, could, in equity, be permitted to redeem one mortgage without redeeming the other. Per Lurton, Circuit Judge.

27. RAILROADS—DIVISION—PUBLIC POLICY.

It seems that it is the settled policy of courts to treat a railroad as an entirety, and prevent its severance, where possible to do so, in the exercise of discretion. Per Lurton, Circuit Judge.

28. EQUITY PRACTICE—ANCILLARY SUITS—IDENTICAL DECREE.

It seems that the identical decree entered in the suits in the several districts was not solely valid in each, as affecting the property within the several jurisdictions, but effected a unit sale of the whole property in the several jurisdictions, valid under each decree. Per Lurton, Circuit Judge.

29. COLIENORS—SEPARATE SECURITIES.

It seems that the lien created by the merger of the T. & W. Ry. Co. in the T., W. & W. Ry. Co. was for the benefit of the bondholders under the Indiana divisional mortgage for any deficiency in their mortgage security, as well as for the equipment bondholders and other creditors, and that such bondholders, through the trustees, as well in the Ohio as in the Indiana suit, or the purchaser at the foreclosure sale, as equitable assignee of the mortgage debt, had a right to object to a separate redemption of the Ohio Division by C. Per Lurton, Circuit Judge.

30. MORTGAGES—REDEMPTION—MORTGAGEE IN POSSESSION.

It seems that it did not appear that the assignee of the purchaser at the sale under the K. and J. decree was in possession of the railroad as mortgagee under a mortgage superior to C.'s lien, and that C. was not entitled to a deduction for net profits. Per Lurton, Circuit Judge.

31. JUDGMENT—RES ADJUDICATA.

It seems that the decree rendered in the Indiana suit instituted by K. and J., not having been appealed from, was conclusive upon an appeal from a like decree in the Ohio suit. Per Lurton, Circuit Judge.

Appeal from the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

This was a suit by James R. Jesup and Edward H. Dixon against the Wabash, St. Louis & Pacific Railway Company and others for the foreclosure of a mortgage. James Compton was made a party, to determine his rights under a lien asserted by him to part of the mortgaged property, and appealed from so much of the final decree as fixed his rights.

This is an appeal from that part of a decree in a railroad mortgage foreclosure suit rendered by the circuit court of the United States for the Northern district of Ohio which fixes the priority of a lien of the appellant, and prescribes the remedy for its enforcement. James Compton, the appellant, was a citizen of the District of Columbia. Holding equipment bonds issued by the Toledo & Wabash Railway Company, which subsequently became one of the constituent companies of the Wabash System, he obtained a decree from the Ohio supreme court (16 N. E. 110, and 18 N. E. 380) declaring them to be a valid lien on that part of the main line of the Wabash System reaching from Toledo west to the Illinois line, and awarding to him, as a means of enforcing the lien, an order for sale of the portion of the line lying in Ohio. Shortly after the entry of this decree by the Ohio supreme court, and before it was executed, upon the prayer of the complainant and a cross complainant in the foreclosure proceeding in the court below, and after the filing of the necessary affidavit, the court entered an order based on section 8 of the act of congress of March 3, 1875,

directing that Compton be served with subpoena in the District of Columbia, and required to appear and set up his lien in this cause. The order was complied with, and Compton, appearing only for the purpose of objecting to the validity of the service, moved the court to set the service aside, and to dismiss him from the case. The motion was overruled. He then demurred to the jurisdiction on the ground that citizens of the same state appeared on both sides of the controversy. His demurrer was overruled. The amendments to the bill and cross bills concerning Compton denied the validity of his lien, and asserted that he was estopped by matter of record to claim a lien, because of a decree of the supreme court of the United States, to which he was in law privy, in the case of Railway Co. v. Ham, 5 Sup. Ct. 1081, denying the existence of a lien in favor of the equipment bondholders. Compton, in his answers which he filed after his demurrer was overruled, set up his lien as declared by the Ohio supreme court decree, and his right thereunder to have the Ohio Division sold to satisfy it. Compton also claimed in his answer that his bonds were a first lien upon certain terminals of the defendant company at Toledo, on the ground that the Ohio divisional mortgage did not cover this property. The court below adjudged that Compton had a valid lien on the Ohio and Indiana Lines, by virtue of the Ohio decree, but denied his right to a first lien on the Toledo terminals, or to a separate sale of the Ohio Line, and declined to afford him any relief but that of redeeming the four divisional mortgages,—two on the Ohio Line, and two on the Indiana Line,—by the payment of about $8,000,000. The sale under the decrees of foreclosure in the court below, against Compton's objection, took place before the validity and character of his lien were determined, and a provision was inserted in the decree saving his rights. Compton contended that the language of this saving clause entitled him to the payment of his lien by the purchaser, or, in default thereof, a resale of the Ohio part of the railroad. At the hearing of the appeal a motion was made to dismiss on the ground that the same decree as that here appealed from was entered by the United States circuit court for Indiana in a case between the same parties. This appeal presents the questions: (1) Had the court jurisdiction of the original bill? (2) Had it power to make Compton party by substituted service? (3) Was Compton estopped·to assert a lien for his bonds by a decree of the United States circuit court for Indiana denying it for bonds of the same kind, in what was claimed to be a representative suit? (4) Did the Ohio divisional mortgages not cover certain after-acquired terminal property at Toledo, so that Compton had a first lien thereon? (5) What was the effect of the proviso in the decree of sale upon Compton's rights and remedy? (6) What relief was he entitled to under the Ohio decree? (7) Is Compton estopped to prosecute this appeal by the fact that a decree identical in terms with the one here appealed from was entered in the United States circuit court for Indiana, and has not been appealed from? The facts of the case are quite complicated, and many of them must be stated, for a clear understanding of the issues.

The Wabash, St. Louis & Pacific Railway Company, usually known as the "Wabash System," comprised, as its main line, a railroad which ran from Toledo, Ohio, west, through Ohio, Indiana, Illinois, and Missouri, to Kansas City. It was the result of a consolidation of separate railroads,—one in Ohio, one in Indiana, three or four in Illinois, and one or more in Missouri. First the Ohio and Indiana companies were consolidated, then the companies east of the Mississippi river, and finally, in 1880, all of them were united in the Wabash, St. Louis & Pacific Company. Many of the constituent companies had issued bonds secured by mortgage upon their respective lines, and as consolidations took place the new companies assumed the obligation of the mortgage and bonded debts of their constituents. When the Ohio and Indiana companies were united, in 1858, under the name of the Toledo & Wabash Railway Company, there were two mortgages on the Ohio part,—one to the Farmers' Loan & Trust Company, trustee, to secure $900,000 of bonds, and a second to E. D. Morgan, trustee, to secure bonds amounting to $1,000,000. There were also two mortgages on the Indiana part,—one to the Farmers' Loan & Trust Company, trustee, for $2,500,000, and a second to E. D. Morgan, trustee, for $1,500,000. The

Toledo & Wabash Company, in 1862, issued equipment bonds to the amount of $600,000, but gave no mortgage to secure them. It is $150,000, par value, of the equipment bonds, which is the subject-matter of this appeal. In 1865 the Toledo & Wabash Railway Company united with several Illinois companies, and became the Toledo, Wabash & Western Company, with a line reaching from Toledo to the Mississippi river. It was this consolidation which the supreme court of Ohio held, by virtue of the Ohio statute authorizing it, to have the effect of fastening the equipment bonds as a lien on the property of the Toledo & Wabash Railway Company, which passed to the new company. The articles of agreement contained the following provisions:

"Now, therefore, the said companies, by their respective directors, agree to consolidate their said roads, property, and capital stock into one company, upon the basis and conditions hereinafter specified, to be submitted by the directors of each of said roads, to the stockholders thereof, for ratification, to wit:

"The Toledo and Wabash Railway Company enters into said consolidation on the following basis, viz.:

| | |
|---|---:|
| Its capital is | $ 10,000,000 |

Composed as follows:

| | |
|---|---:|
| First mortgage bonds | $ 3,400,000 |
| Second mortgage bonds | 2,500,000 |
| Convertible equipment bonds | 600,000 |
| Convertible preferred stock | 1,000,000 |
| Common stock | 2,500,000 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"It is further agreed that, on the terms and condition above specified, the four railroad companies hereto do agree, each for itself, severally, that the several companies named shall be, and they hereby are, consolidated into and form one corporation," etc. "\* \* \* It is further agreed that the bonds and other debts hereinabove specified, in the manner and to the extent specified, and not otherwise provided for in this agreement, shall, as to the principal and interest thereof, as the same shall respectively fall due, be protected by the said consolidated company, according to the true meaning and effect of the instruments or bonds by which such indebtedness of the several consolidating companies may be evidenced."

The new company, the Toledo, Wabash & Western Railway Company, shortly after the consolidation, issued a mortgage to Knox and Jesup, trustees, upon its entire road, known as the "Consolidated Mortgage," with the purpose therein recited of using the proceeds of their sale to take up and refund all previous indebtedness, including the equipment bonds. The purpose was never carried out, but some $2,500,000 of bonds were issued, and the proceeds expended for the use of the company. In the foreclosure of a subsequent mortgage, called the "Gold-Bond Mortgage," and the consequent reorganization, the property of the Toledo, Wabash & Western Company passed, subject to all previous mortgages, to a consolidated company of the same three states, called the Wabash Railway Company, which issued bonds amounting to $2,000,000, secured by mortgage on its line, to Humphreys and Lindley, trustees. Then the Wabash Company united with a Missouri company to make the Wabash, St. Louis, & Pacific Company a consolidated company, of Ohio, Indiana, Illinois, and Missouri, with a line of railway extending from Toledo to Kansas City. This company issued bonds amounting to $17,000,000, and secured them by mortgage on its entire line to the Central Trust Company, and James Cheney, of Indiana, as trustees. In 1884 the Wabash, St. Louis & Pacific Railway Company filed a bill in the circuit court for the Eastern district of Missouri against the Central Trust Company, a citizen of New York, and James Cheney, a citizen of Indiana, trustees under the last mortgage, averring its insolvency, praying for the appointment of a receiver, the marshaling of liens upon it, the sale of its road, and a distribution of proceeds for the benefit of its creditors. A similar bill was filed in the circuit courts for the Northern district of Ohio, and for other districts. Receivers were appointed, who took possession of the railroad, and operated it. Shortly afterwards the Central Trust

Company and Cheney filed a bill to foreclose their mortgage in the state courts of the several states where the mortgaged property lay. These suits were removed to the proper federal courts, and were consolidated with the insolvency bills, so called, already referred to. The consolidated causes proceeded to decrees for sale in the various jurisdictions. The property was bid off in each court to James F. Joy and others, a purchasing committee under a plan of reorganization entered into by the foreclosing bondholders. The sales were confirmed, and deeds ordered to be executed. The committee took possession from the receivers of the part of the railroad west of the Mississippi river, but for some reason, not clearly disclosed in the record, the court did not order the receivers to deliver possession to the purchasers of the lines east of the Mississippi. The sale of Joy and associates in Ohio was expressly subject to the Humphreys and Lindley mortgage, the Knox and Jesup mortgage, the Compton lien, if any he had, and the Ohio divisional mortgages. While the railroad in Illinois, Indiana, and Ohio was still in the hands of the receivers, Knox and Jesup began the proceeding in which this appeal was taken, by filing a bill against the Wabash, St. Louis & Pacific Railway Company to foreclose their mortgage in the circuit courts of Northern Ohio, Indiana, and Illinois, and for the appointment of receivers, and made parties defendant those holding mortgages on the part of the road within each jurisdiction, as well as the purchasing committee at the former sale. Humphreys and Lindley and the Farmers' Loan & Trust Company filed answers, which, by stipulation, were taken as cross bills, setting up their mortgage liens on the Ohio property, and praying a foreclosure and sale. The bills and cross bills all averred that at the time of filing the same the road was in the possession of the receivers appointed by the court below in the previous foreclosure suit. Citizens of the same state appeared on both sides of the controversy thus presented. Compton was made a party, in the way already stated, both to the Indiana and Ohio bills and cross bills. The litigation in the courts of the three states proceeded together. Mr. Justice Jackson, then the circuit judge for the Sixth circuit, and Judge Gresham, the circuit judge for the Seventh circuit, sat together, heard the points in dispute argued, and made the same orders, in their respective jurisdictions. The pleadings in the court below are quite confusing, and do not seem to have been prepared or filed with much care to keep separate the jurisdictions of the circuit courts of the three districts in which the litigation was pending. The amended bill of Knox and Jesup recited that a similar bill had been filed in the Southern district of Illinois, and attached the same as an exhibit. Both bills made parties all persons having or claiming an interest in any part of the line in the three states. Among these defendants was James F. Joy, as substituted trustee under the second Ohio divisional mortgage, and also as substituted trustee under the second Indiana divisional mortgage. The cross bill of Humphreys and Lindley, trustees under the mortgage issued by the Wabash Railway Company on the entire line east of the Mississippi river, made the same parties as in the amended bill. The amended cross bill of the Farmers' Loan & Trust Company, seeking to foreclose that part of the railroad lying in Ohio, only made parties defendant those having a mortgage lien on the Ohio Division. Compton was made a party to this cross bill, as was also James F. Joy, as trustee under the second mortgage on the Ohio property. By some error, Joy, as an answer to the amended bill of complaint, and the cross bills of Humphreys and Lindley and of the Farmers' Loan & Trust Company, filed the same answer made by him in the Indiana suit, in which he only set up, and asked to be protected in, his rights as substituted trustee in the mortgage of the Wabash & Western Railway Company, and made no averment or prayer in regard to the mortgage on the Ohio part of the railroad, in which he had also been substituted as trustee in place of E. D. Morgan, trustee. Other answers were filed by parties defendant, and the cause proceeded in the three different courts in Ohio, Indiana, and Illinois as if the same questions were pending in each court, and the same issues were raised, without respect to the territorial jurisdiction of each court. Identically the same decree, foreclosing all the mortgages on all the railroad property east of the Mississippi river, divisional and otherwise, was entered in each district. The decree was entered March

23, 1889. Compton was not required to answer the bill and cross bills until April following, so that when the decree for sale was passed, the controversy over his claim was not at issue. This decree, though entered in the circuit court for the Northern district of Ohio, purports to foreclose divisional mortgages in Indiana and Illinois, and to order to a separate sale property without the territorial jurisdiction of the court, although there is no prayer for such relief, and there is nothing in the decree intended to operate upon the defendant mortgagor company to compel a conveyance of property in another jurisdiction. The decree provided that each division of the road covered by an underlying divisional mortgage should be offered separately, and then the whole road east of the Mississippi river should be offered as a unit. If the sum offered for the whole road exceeded the total of the separate bids, the road was to be struck off to the one making the unit bid, and the share of each division in the amount of the unit bid was to be determined in the proportion of the separate bids. The decree provided that no bid should be received on the Ohio bid which did not equal the sum due on both the Ohio divisional mortgages, and that no bid should be received on the Indiana Division which did not equal the amount due on the first Indiana divisional mortgage. Under this decree, Joy and his associates, the purchasing committee in the previous foreclosure proceedings, became the purchasers of the road, on their unit bid of $15,500,000. This exceeded by several thousand dollars the sum total of the bids on the separate divisions of the road. The separate bid on the Ohio property amounted to $2,840,595.68, or a little more than enough to pay the principal and interest of the two divisional mortgages. The separate bid on the Indiana Division was $3,650,000. This was about $1,300,000 less than would have been required to pay the second divisional mortgage on that division. The purchasing committee organized a new company, called the Wabash Railroad Company, to which they conveyed the railroad.

The new company was made a party below to contest Compton's lien, and his right to a resale or redemption of the Ohio property, and is a party to this appeal, to oppose the reversal or modification of the decree, claiming to assert the rights of all mortgagees whose interests passed to the purchaser by the foreclosure proceeding. Because of the discussion of the effect of the decree for sale on Compton's right, it is necessary to make a somewhat fuller reference to it. After finding the amount due upon each mortgage, and foreclosing each mortgage in default of the several payments directed to be made by the mortgagors, the decree ordered a sale at the city of Chicago, at which the mortgaged property should first be offered for sale separately, as described in each of the divisional mortgages. It was further provided that there should be deposited with the special master, as security for each bid, $100,000 in cash or in bonds; that after such bids had been made they should be accepted conditionally upon the result of the offer of the entire railway as a unit; that, if the highest bid for the railroad as an entirety exceeded the sum of the highest bids for the separate divisions, the entire property should be struck off to the highest bidder for the entire road; that in such case the court would distribute to each division its share of the unit bid, in proportion to the separate bids received for the separate divisions; and that in case of a sale of the property as a unit the purchaser must deposit, in cash or in bonds, $900,000, as a pledge that he would comply with his bid. The provision with reference to the payment was as follows: "There shall be paid in cash, of the price at which the said mortgaged premises and property shall be sold, in addition to the amount which may be paid at the time of sale, such further sums thereafter of the purchase money as the court may direct. The remainder of such purchase price may be paid either in cash or in bonds, with the overdue coupons thereto appertaining, at such proportion or value as the holders thereof would be entitled to receive thereon in case the said purchase price were paid by the purchasers in cash; and in all cases in which bonds shall be received by the said special masters, whether as a deposit at the time of said sale or sales, to bind the bids thereat, or in payment of the remainder of the purchase price at the time of the consummation of such sale or sales, the said bonds shall be so received at the rate or amount to which the holders thereof will be entitled to dividend thereon;

and, in case of the receipt of bonds for security at the time of sale, the said special masters shall at the time exercise their judgment in determining the probable amount of the dividend to which such bonds will be entitled."

The decree directed that upon the confirmation of the sale by the court, and the full payment of the entire purchase price, and the compliance by the purchaser with the condition of the sale and orders of the court in that behalf, the special masters should convey the property by good and sufficient deed to vest in the grantee "all the right, title, estate, interest, property, and equity of redemption, except as hereby reserved, of, in, and to all and singular the real estate, property, premises, and franchises therein described, in fee simple forever, and shall entitle the grantees to the possession thereof." All questions of account between the several different divisions of the railway as to earnings and expenses, as to payments made by the receivers on coupons or bonds secured by the mortgages upon the divisions, and all questions of the disposition of the proceeds arising from the sales under the decree, were reserved for future settlement and adjustment. The masters were required to pay the proceeds into court, to remain subject to the further order of the court. The decree then proceeded:

"All other questions arising under any of the pleadings or proceedings herein, not hereby disposed of or determined, are hereby reserved for future adjudication, including the claim for unearned interest on bonds not yet due. And the defendant James Compton having in open court, on the final hearing herein, objected to the rendering or entry of any decree in this cause at this time, on the ground that the issue raised by the amendment to the complainants' amended and supplemental ancillary bill, and to the cross bill of the cross complainants Solon Humphreys and Daniel A. Lindley, trustees, and the answers of the defendant James Compton to be filed herein, have not been tried and determined, the court overrules such objection; and the defendant James Compton duly excepts to such ruling, and the entry of this decree. But it is adjudged and decreed, in the premises, that the rendering and entry of this decree in advance of the trial and determination of such issues is upon and subject to the following condition, to wit: If, upon the determination of such issues, it shall be adjudged by this court that the decree rendered by the supreme court of the state of Ohio in the suit brought by said James Compton against the Wabash, St. Louis & Pacific Railway Company and others, referred to in the pleading herein, and the lien thereby declared and adjudicated in his favor, continue in full force and effect, then the purchaser or purchasers at any sale or sales had hereunder, of that portion of the property sold, covered, and affected by said lien, or the successors in the title of said purchaser or purchasers, shall pay to said James Compton, or his solicitors herein, within ten days after the entry of the decree herein in favor of said James Compton, the sum of three hundred and thirty-nine thousand nine hundred and twenty dollars and forty cents, with interest thereon at six per cent. per annum from May 1, 1888, being the amount found due on the equipment bonds by him owned, by the supreme court of Ohio, in his said suit, upon the surrender by him of the bonds and coupons owned by him, referred to in his petition in such suit; and in default of such payment this court shall resume possession of the property covered and affected by the said lien of the defendant James Compton, and enforce such decree as it may render herein in his favor by a resale of such property, or otherwise, as this court may direct. And it is further ordered and adjudged that, notwithstanding the entry of this decree, the said issues concerning the claim and interest of said Compton shall proceed to a final determination and decree in accordance with the rules and practice of this court, and any decree rendered thereupon shall bind the purchaser or purchasers at any sale or sales had hereunder, and all persons and corporations deriving any title to or interest in the said property affected by such lien, from or through them, or any of them; and nothing in this decree contained shall be construed as an adjudication of any matter or thing, as against the said James Compton, or to prejudice, annul or abridge any right, claim, or interest or lien which the said James Compton may have in, to, or upon the premises hereby directed to be sold, or any part thereof, or in, to, or upon any property whatsoever embraced in this decree, it being the intention to hereby preserve the rights of said Compton in the relation in which he now stands towards the mort-

gagees, parties hereto." "Any sale, conveyance, or assignment of the railway and property hereinabove described, made under this decree, shall not have the effect of discharging any part of said property from the payment, or contribution to the payment, of claims or demands chargeable against the same, whether for costs and expenses, the expenses of the receivership of said property, and the full payment of all the debts and liabilities of the receivers of the Wabash, St. Louis & Pacific Railway Company, namely, Solon Humphreys and Thomas E. Tutt, Thomas M. Cooley and General John Mc-Nulta, or upon intervening claims and allowances that have been, or may hereafter be, charged against the property of the Wabash, St. Louis & Pacific Railway Company, or any part thereof, or said receivers, or either of them, or the adjustment of any equities arising out of the same between the parties thereto, or their successors, either by this court, or by the circuit court of the United States for the Eastern district of Missouri, or by any United States circuit court exercising either original or ancillary jurisdiction over said property of the Wabash, St. Louis & Pacific Railway Company, or any part thereof, or by any United States circuit court, to which any of the parties in the consolidated cause of the Central Trust Company of New York and others against the Wabash, St. Louis & Pacific Railway Company and others, in the circuit court of the United States for the Eastern district of Missouri, including the receivers, have been by said circuit court of the United States remitted in proceedings or actions ancillary to the jurisdiction of said last-named court, or otherwise. Nor shall any such sale, conveyance, transfer, or assignment made under and pursuant to this decree withdraw any of said railroad property or interests to be sold under this decree, as hereinbefore directed, from the jurisdiction of this and the other courts aforesaid; but the same shall remain in the custody of the receiver until such time as the court shall, on motion, direct said property, in whole, or, from time to time, in part, to be released to the purchaser or purchasers thereof, or any of them, and shall afterwards be subject to be retaken, and, if necessary, resold, if the sum so charged or to be charged against said property, or any part thereof, or said receivers, shall not be paid within a reasonable time after being required by order of this or said other courts. The conveyance and transfer of said property sold under this decree shall be subject to the powers and jurisdiction of the said courts, and the purchasers of the property sold under this decree, or any part thereof, and the parties hereto, or their successors, shall thereby become and remain subject to said jurisdiction of said courts, so far as necessary to the enforcement of this provision of this decree; and such jurisdiction shall continue until all the claims and demands that have been or may be allowed against said property of the Wabash, St. Louis & Pacific Railway Company, or any part thereof, or said receivers, by order of said courts, shall be fully paid and discharged. The provision aforesaid shall apply to the purchasers of the same under this decree, and all persons taking said property through or under them; but the foregoing provisions shall not, nor shall any reservation of this decree contained, have the effect or be construed, nor are they or any of them intended, to give to any claims that may exist any validity, character, or status superior to what they now have, nor to decide or imply that any such claims exist. The effect of said provisions and reservations shall be to prevent this decree operating as an additional defense to claims, if any there are, prior in right to the liens of the mortgages upon said property heretofore and hereby foreclosed, and to preserve the prior right and lien of such claims, and all allowances, if found and decreed to exist."

The masters reported the making of the sale in accordance with the decree, and the sale was confirmed May 18, 1889. On June 18th an order requiring the masters to execute a deed, and to deliver possession, was made. This order recited that the purchasers had on deposit a large number of the bonds under all the mortgages, giving the exact amount of each, and then proceeded: "And it further appearing that the said purchasers, by their said petition, offer to deposit, at such time and in such amounts as the court may direct, cash sufficient to pay the expenses that the court may require to be paid, and to pay such sum on first mortgage bonds and funded debt bonds not deposited in said trust company as the court may

direct to be paid in cash, and, as security for such payment, to deposit all or any part of the bonds held by said trust company as the court may direct, and to substitute cash for bonds at such time and in such amounts as the court may require cash payments, and, further, to hold the said purchased property subject to be retaken by the court in the event any cash payments directed by the court shall not be made in pursuance of the court's directions. The court, thereupon, having duly considered the premises, does order, adjudge, and decree that the prayer of said petition be granted; that the said purchasers shall forthwith transfer to the said special masters, Bluford Wilson and A. J. Ricks, the bonds deposited with the Central Trust Company of New York, and hereinbefore mentioned, to be held and disposed of by said special masters as the court may direct. Notwithstanding such transfers of said bonds to said masters, said purchasing committee shall pay all such sums as may be required from them in carrying out their purchase; and in case of their failure to comply with any orders of the court with respect thereto the court may retake the property, and all of it, conveyed by said deed, and annul the title of the purchasing committee with respect thereto, and hold the same for further disposition, and as security for the rights of the bondholders under the various mortgages foreclosed. Upon such transfer the said special masters shall forthwith make, execute, and deliver to said purchasers a deed or deeds conveying to them or their assigns, all and singular, the railways, premises, and property described in and covered by the said several mortgages foreclosed and sold as aforesaid under the decree in this cause, and all the right, title, interest, and estate of all the parties in said cause, of, in, and to the same, and each and every part thereof, except as particularly reserved in and by said decree of foreclosure and sale, by a good and sufficient deed therefor." Then followed an order to deliver possession, closing with these words: "This order is made subject in all respects to the provisions of said decree of March 23, 1889." On August 17, 1889, the court ordered "that the issues presented in this cause as to the lien and claim of James Compton, made by the various pleadings herein, upon and concerning said claim and lien, and reserved in the former decree herein, saving the rights of said Compton, be, and the same are hereby, referred to Bluford Wilson," etc. The special master reported that Compton's lien was a valid one, and that he was entitled, by the saving clause of the decree, to have the Ohio Division resold, if the purchaser did not pay off his bonds, principal and interest, in full. The court below sustained the master in holding Compton's lien valid, but decided, as already stated, that his only remedy was to redeem the four divisional mortgages,—two in Ohio, and two in Indiana. Compton's counsel filed affidavits at the final hearing below to show that their client was deterred from bidding by their advice that the saving clause in the decree made it unnecessary for him thus to protect his claim, because, if his lien was held to be valid, the purchaser was required to pay it off, or let the property go to a resale, and that, but for his reliance on the saving clause, Compton could easily and safely have made a bid high enough to secure the payment of his claim from the proceeds of sale.

The facts on which turned the issue as to whether the divisional mortgages were a first lien on the Toledo terminals were as follows: The first Ohio company was the Toledo & Illinois Railroad Company. Its charter of incorporation, dated April 20, 1853, provided for building a railroad from the city of Toledo, through the counties of Lucas, Henry, Fulton, Defiance, and Paulding, or parts of said counties, to the west boundary line of the state of Ohio, in the township of Harrison, in Paulding county. On September 8, 1853, it made a mortgage (known as the "First Ohio Mortgage") to the Farmers' Loan & Trust Company, to secure an issue of bonds amounting to $900,000. The property covered by that mortgage was described as follows, viz.: "Their road, made and to be made, including the right of way and the land occupied thereby, together with the superstructure and tracks thereon, and all rails and other materials and machinery used thereon or procured therefor, including the furniture and equipments of the road, and those to be purchased or paid for with the above-described bonds, and the bridges, viaducts, culverts, fences, depot grounds, and build-

ings erected or to be erected thereon, and all franchises, rights, or privileges of the said party of the first part of, in, to, or concerning the same." The habendum clause is: "To have and to hold the said premises, and every part thereof, with the appurtenances, unto the same party of the second part." In June, 1856, the Toledo & Illinois Railroad Company entered into an agreement of consolidation with the Lake Erie, Wabash & St. Louis Railroad Company, and the Toledo, Wabash & Western Railway Company was thereby formed. That agreement provided that "all mortgages given by either of the parties shall be as valid and binding upon the whole of the road, real estate, fixtures, and personal property which may be described in such mortgage as though the same had been originally executed by such consolidated corporation." The Toledo, Wabash & Western Railway Company made a mortgage, which was subsequently foreclosed. By the decree of sale the purchaser of the Ohio part, Boody, took subject to the first mortgage. Boody conveyed the Ohio Division to a new Ohio corporation, organized with power to construct, maintain, and operate a road from Toledo to the Indiana state line, and called the Toledo & Wabash Railroad Company. This company, on October 12, 1888, gave a bond to Edwin D. Morgan, trustee, for $900,000, and secured it by mortgage of its railroad, made and to be made, all right of way and all land occupied thereby, together with the superstructure, depots, depot grounds, and buildings erected thereon, and the rails, tracks, side tracks, bridges, fences, viaducts, culverts, rights, privileges, franchises, and accessions of the party of the first part, together with all its rolling stock, machinery, furniture, and equipments of its said road now and hereafter to be acquired; being the same property described in the deed of Matthew Johnson, marshal and commissioner, to A. Boody, Esq., and dated October 8, 1858, and by A. Boody conveyed to the party of the first part. The habendum clause was: "To have and to hold the premises, and every part and parcel thereof, and all its increase, accessions, and incidents, unto the said Morgan and his successors," etc. The condition of the mortgage and bond was that the Toledo & Wabash Railroad Company would pay the $900,000 of bonds issued by the Toledo & Illinois Railroad Company, and secured by the first mortgage. The mortgage recites that it is executed for the benefit of the bondholders under the first mortgage. On October 15, 1858, the Toledo & Wabash Railroad Company gave a second mortgage to E. D. Morgan, trustee, in which the description of the property conveyed is the same as above, as is also the habendum clause. The true intent and meaning of this mortgage is declared to be as follows: "First. That this mortgage attaches to the property above described, as subject to and subordinate to said bonds of the Toledo & Illinois Railroad Company, or said issue of nine hundred thousand dollars, whether evidenced by said bond of the party of the first part, made to Edwin D. Morgan, trustee," etc. "Second. That the party of the first part, or any railroad company into which it may become a component part by consolidation, shall be chargeable with said sum of nine hundred thousand dollars, as a prior lien and incumbrance to any other debt thereon." The Toledo & Wabash Railroad Company of Ohio. soon after executing the foregoing mortgages, entered into articles of consolidation with the Wabash & Western Railway Company, an Indiana corporation, thereby forming the Toledo & Wabash Railway Company. It was provided in that agreement that all mortgages given by either of the parties "shall be as valid and binding upon the whole of the road, real estate, fixtures, and personal property which may be described in such mortgage as though the same had been originally executed by such consolidated corporation." This company took possession of the property, and operated it. Later it acquired certain terminal property in Toledo. It issued the equipment bonds. It made no mortgage at any time. In 1865 the Toledo & Wabash Railway Company and various Illinois companies entered into an agreement of consolidation, whereby the Toledo, Wabash & Western Railway Company was formed. It was this agreement which created the lien in favor of the equipment bonds which was adjudicated in Compton's suit.

Another issue raised by the bill and cross bills and Compton's answers was the effect of a decree of the United States circuit court of Indiana denying

the existence of a lien in favor of equipment bonds of the same issue as those held by Compton, upon the Ohio decree in Compton's favor. It was contended by complainant below that Compton was a party to the Indiana decree, and was thereby estopped to plead the Ohio decree. The master and the court below decided in Compton's favor on this point. The facts in respect to this issue were as follows: In 1878 one Tysen brought suit on behalf of himself and such other owners of equipment bonds of this issue as might desire to come into said suit, and contribute to the expense thereof, to establish that the bonds entitled their owners to a lien on the part of the Wabash main line, extending from Toledo to the Illinois state line. The cause was removed to the federal circuit court, and resulted in a decree sustaining the lien. Railway Co. v. Ham, 114 U. S. 587, 5 Sup. Ct. 1081. It was appealed to the supreme court of the United States. The decree of the lower court was reversed, and the bill of complainant was dismissed. To this action Compton never became a party. His counsel did file a brief in the supreme court, but he paid no part of the expense of the suit. In 1880, pending the suit in the Indiana court, but prior to the rendition of the Indiana decree, Compton began a suit in the common pleas court of Lucas county to establish and enforce a lien on the railroad extending from Toledo to the Illinois state line, by virtue of his ownership of $150,000 of the par value of these equipment bonds. Compton made parties to this suit all the railway companies succeeding the Toledo & Wabash Railway Company (which issued the equipment bonds) in the ownership of the property, and all the mortgagees whose mortgages were executed, after the issuance of the bonds, except the Central Trust Company and Cheney, trustees, who took their mortgage pending the appeal from the common pleas decree. Neither the Farmers' Loan & Trust Company nor E. D. Morgan, trustees of the underlying Ohio divisional mortgages, were parties. In March, 1882, the common pleas court entered a decree sustaining the lien claimed, and ordered a sale of the part of the railroad in Ohio to pay the amount of the bonds found due, subject to the prior lien of the mortgages of the Farmers' Loan & Trust Company and E. D. Morgan, trustee, on the same property. The cause was appealed to the district court of the proper judicial district, and by that court reserved for decision to the supreme court of the state, which in 1888 sustained the ruling of the common pleas court (Compton v. Railway Co., 45 Ohio St. 592, 16 N. E. 110, and 18 N. E. 380), found that the amount due on Compton's bonds was $339,920.40 with interest from May 1, 1888, and that this amount was a lien on the railroad in Ohio and Indiana, and ordered that, on default in the payment of the amount due after 10 days, the Ohio part of the road should be sold to enforce the lien.

The finding and action of the supreme court of Ohio sufficiently appeared from the fifth and sixth paragraphs of its decree, as follows: "That upon the consummation of such consolidation said bonds issued as aforesaid by the Toledo & Wabash Railway Company, known as 'Equipment Bonds,' and all moneys due and to grow due thereon, and among them such of said bonds as are now owned as aforesaid by the plaintiff, and the moneys due and to grow due thereon, became an equitable lien upon all of the said railroad and real property, and the structures thereupon, and the fixtures and appurtenances thereto appertaining, which were owned by said Toledo & Wabash Railway Company at the time of said consolidation, and which, through said consolidation, passed to and vested in the said Toledo, Wabash & Western Railway Company, and which afterward passed to and vested in the defendant the Wabash, St. Louis & Pacific Railway Company, which last-named company was at the time of the commencement of this suit in possession of the same, being all of its railroad, and property connected therewith, commencing in the city of Toledo, in the state of Ohio, and extending therefrom, through the counties of Lucas, Henry, Fulton, Defiance, and Paulding, in said state, and through the counties of Allen, Huntington, Wabash, Miami, Cass, Carroll, Tippecanoe, Fountain, and Warren, in the state of Indiana, to and terminating at a point in the west line of State Line city, in said last-named county, and that said bonds are now a lien on such railroad and property, and the plaintiff is entitled to enforce the same. That the said lien of said bonds is prior and superior to

the rights, interests, estates, claims, and liens of the defendants in this action, and each of them, in and upon said railroad and property, upon which said lien is hereby declared, and is prior and superior to the rights, interests, estates, claims, and liens of all persons and corporations who have derived any such rights, estates, claims, and liens from, by, or through the said defendants, or any of them, since the commencement of this action, or otherwise. But, as to all that part of said railroad and property which is situate within the state of Ohio, such lien is inferior and subject, but inferior and subject only, to the two mortgages mentioned in the petition herein, one of which was executed by the Toledo & Illinois Railroad Company to the Farmers' Loan & Trust Company on the 8th day of September, 1853, for the security of the bonds of that company amounting to $900,000, due, as extended, August 1, 1890, and bearing interest at the rate of seven per cent. per annum, payable semiannually on the 1st day of February and August in each year, and the other of which was executed by the Toledo & Wabash Railroad Company to Edwin D. Morgan, trustee, on the 5th day of October, 1858, for the security of the bonds of that company amounting to $1,000,000, due on the 1st of November, 1878, and bearing interest at the rate of seven per cent. per annum, payable semiannually on the 1st day of May and November in each year. (6) That the said defendants, or any of them, pay to said plaintiff the said sum of $339,920.40 now due on said bonds owned by the plaintiff as aforesaid within ten days from the entry of this decree, and, if default shall be made in such payment, that an order of sale issue for the sale, as upon execution at law, of all said railroad and real property, together with the structures thereupon and the fixtures and appurtenances thereto appertaining, upon which the lien of said bonds known as 'Equipment Bonds' is hereby declared to exist, which is situated in the state of Ohio, and the jurisdiction of this court, subject, however, but subject only, to the lien of the two mortgages hereinbefore mentioned as executed by the Toledo & Illinois Railroad Company to the Farmers' Loan & Trust Company, and the Toledo & Wabash Railroad Company to Edwin D. Morgan, and to the indebtedness secured by each of said mortgages, and that from the proceeds of such sale the costs of this action, as taxed, to be paid, and the residue of such proceeds be brought into court, to abide its further order herein on the footing of this decree. That before offering the property, hereby directed to be sold, for sale, the officer conducting the same shall cause the same to be appraised according to law by three disinterested freeholders of either or any of the counties in which the same is situated, and such appraisal shall be of the value of said property, subject to the incumbrance and lien of the two mortgages hereinbefore mentioned, as executed, respectively, by the Toledo & Illinois Railroad Company and the Toledo & Wabash Railroad Company, subject to which it is directed to be sold, and over and above the lien of such mortgages, according to the amount of the indebtedness secured thereby, as the same shall be ascertained by the officer conducting such sale, with interest computed to the time of the sale."

After this case had been appealed to this court, and before the hearing, a motion was made by appellees to dismiss the appeal, or affirm the decree of the court below, on the ground that since the rendition of the decree herein a decree had been rendered in the United States circuit court for Indiana, on the same cause of action, limiting Compton's remedy to a redemption of the four senior mortgages,—two in Ohio, and two in Indiana, —and no appeal had been taken from that decree, and the record of the Indiana suit was filed to establish ground for the motion. The record shows that the Indiana decree was exactly like that from which this appeal was taken, and contained the same provision in respect to Compton's lien, requiring him to redeem the Ohio and Indiana Division by payment of the amount due on both the Ohio and the Indiana divisional mortgages within 10 days, or to be forever barred of claiming anything thereunder.

John H. Doyle, Judson Harmon, and John G. Milburn, for appellant.

Wager Swayne, Rush Taggart, and Henry Crawford, for Wabash R. Co.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

TAFT, Circuit Judge, after stating the case, delivered the opinion of the court.

The first ground pressed on us by appellant's counsel for reversing the decree of the circuit court is that there was no jurisdiction to enter it. The contention is—First, that the circuit court had no power to entertain and grant relief on the bill of Knox and Jesup, because the parties to it had not the necessary diverse citizenship; and, second, that no power existed to bring in Compton, because, he being a citizen of the District of Columbia, his presence as a party would destroy the necessary diversity of citizenship, even if it before existed. It must be conceded that the circuit court had no jurisdiction to hear and determine the controversies presented by the Knox and Jesup bill, on the ground of diverse citizenship of the parties, for it did not exist. The jurisdiction was assumed on a very different ground. When the bill was filed in the court below, the property which it was thereby sought to sell on foreclosure was in the possession of receivers appointed by that court in a previous litigation instituted to foreclose mortgages junior to the Knox and Jesup mortgage, and to sell the road to pay all junior liens and floating indebtedness. It is true, the litigation had proceeded to foreclosure sale and final decree; but for some reason, not plainly disclosed, the court refused to deliver possession to the purchasers, and retained it in the custody of the court for the purpose of protecting the interests of all the parties to the original litigation. Knox and Jesup wished to foreclose their mortgage, to marshal all liens, to sell the road at the highest price, to preserve the road and its income from waste by the appointment of a receiver. It is manifest that no other court than that in which the receivers then in possession had been appointed could grant such relief. Whether other courts could decree foreclosure and marshal liens, or not, certainly no other court could take possession of and sell the road, and deliver an unclouded title to a purchaser. If Knox and Jesup could not file their bill in the court below, then the act of that court in maintaining possession of the mortgaged property through its receivers would result in great injustice to them, and would constitute an abuse of its process. To prevent this, the court below had inherent ancillary jurisdiction, pending its possession of the railroad, to hear and determine all petitions for relief presented to it in respect of the possession and control of the road. It is of no importance that the custody of the railroad was likely soon to be changed from the court to the intending purchaser under the previous foreclosure proceedings, at which time any tribunal of competent jurisdiction could give all the relief prayed by Knox and Jesup. Their mortgage was then due. They were not obliged to await the uncertain delays of other litigation before taking steps to assert their rights. They therefore properly appealed to the court below, as the only tribunal which could do so, to give them adequate relief at once; and this was properly accorded to them, without regard to the citizenship of the

parties to their bill. The foregoing reasoning is fully supported by many decisions of the supreme court. Necessity and comity both require that where, by its officers acting under color of its order or process, a court has taken into its custody property of any kind, another court, though of equal and co-ordinate jurisdiction, should not be permitted either to oust the possession of the first court, or in any way to interfere with its complete control and disposition of the property for the purpose of the cause in which its action has been invoked. This principle has been laid down by the supreme court of the United States in a long line of cases. Hagan v. Lucas, 10 Pet. 400; Williams v. Benedict, 8 How. 107; Wiswall v. Sampson, 14 How. 52; Peale v. Phipps, Id. 368; Bank v. Horn, 17 How. 151; Pulliam v. Osborn, Id. 471; Freeman v. Howe, 24 How. 450; Youley v. Lavender, 21 Wall. 276; Bank v. Calhoun, 102 U. S. 256; Barton v. Barbour, 104 U. S. 126; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27; Covell v. Heyman, 111 U. S. 176, 4 Sup. Ct. 355; Heidritter v. Oil-Cloth Co., 112 U. S. 294, 5 Sup. Ct. 135; Gumbel v. Pitkin, 124 U. S. 131, 8 Sup. Ct. 379; Railroad Co. v. Gomila, 132 U. S. 478, 10 Sup. Ct. 155; In re Tyler, 149 U. S. 181, 13 Sup. Ct. 785; Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008; Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906. Again, every court has inherent equitable power to prevent its own process from working injustice to any one, and may entertain a petition by the aggrieved person, either in the form of a simple motion, or by intervention pro interesse suo in the cause in which the process issued, or by ancillary or dependent bill in equity, and may afford such relief as right and justice require. The existence of such a power, independent of statutory jurisdiction, is recognized by the supreme court in Freeman v. Howe, 24 How. 450; Minnesota Co. v. St. Paul Co., 2 Wall. 609–633; Railroad Co. v. Chamberlain, 6 Wall. 748; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27; Pacific R. Co. of Missouri v. Missouri Pac. Ry. Co., 111 U. S. 505, 4 Sup. Ct. 583; Stewart v. Dunham, 115 U. S. 61, 5 Sup. Ct. 1163; Phelps v. Oaks, 117 U. S. 236, 6 Sup. Ct. 714; Dewey v. Coal Co., 123 U. S. 329, 8 Sup. Ct. 148; Gumbel v. Pitkin, 124 U. S. 131, 8 Sup. Ct. 379; Johnson v. Christian, 125 U. S. 642–646, 8 Sup. Ct. 989, 1135; Morgan's L. & T. Railroad & Steamship Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 11 Sup. Ct. 61.

Now, it frequently happens that under the process of the federal courts, exercising the original and lawful jurisdiction conferred expressly by the federal constitution and statutes, possession is taken and control exercised over property in which persons not indispensable parties to the suit have an interest, by lien, mortgage, and in other ways. In such cases there often is no diversity of citizenship between such persons and the plaintiff or defendant to the suit which would warrant the federal court in hearing an independent suit between them. But it may be essential, to preserve intact their rights in the property, that such third persons should be permitted, at once, to have specific relief, which can only be granted by a court having possession and control of the property. And yet, in accordance with the principle already stated, no court but the federal court can exercise possession and control over the property in its custody. Of

necessity, therefore, the federal courts exercise an ancillary juris-
diction in such cases; and third persons are permitted to come into
the federal court, and set up their interest in the property, and
secure the same full and adequate protection and relief to which they
would be entitled in any court of competent jurisdiction, were the
property not impounded in the federal court. In Freeman v. Howe, 24
How. 450, a sheriff, under a replevin from a state court sued out by
mortgagees of a railroad company, ousted a United States marshal
from possession of certain railroad cars attached by him under
mesne process from a federal court.    The act of the sheriff was held
void, without respect to the merits of the conflicting claims of the
plaintiffs in the two proceedings, because the cars were in the custody
of the federal court, and beyond the reach of the sheriff, when he
served the replevin.    And it was answered, to the argument that
in this way the replevying mortgagees were left remediless, be-
cause their citizenship prevented recourse to the federal court, that
the federal court, to prevent such abuse of its process, had jurisdic-
tion, ancillary to its original jurisdiction asserted in the attachment,
to afford the mortgagees all the relief they could obtain in any court
where the jurisdiction was not limited by citizenship.    In Bank v.
Calhoun, 102 U. S. 256, a federal court had taken possession, by its
receiver, of the mortgaged railroad in a foreclosure suit.    In an ac-
tion between other parties, an attachment was sued out, and levied
upon the road.    It was held that the federal court, having drawn to
itself the subject-matter of the litigation, had acquired the right and
jurisdiction to decide upon all conflicting claims to the possession and
control of the road, and that the attachment suit which had begun in
the state court could be properly removed, by stipulation of the
parties, to the federal court, because, in the language of Justice
Miller:

"The parties did no more than what they could have been compelled to
do by the injunction of the latter [that is, the federal court], and what
would have been done by such compulsory order, if they had not submitted
to it by agreement."

In Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, a marshal,
on mesne process issuing out of the federal court, attached property,
as the property of the defendant, in the possession of another, who
claimed to own it.    It was held that this other, although a citizen
of the same state as the defendant, might seek redress in the federal
court, either by a petition pro interesse suo, or by ancillary bill, or by
summary motion, according to circumstances.    In this case Mr. Jus-
tice Matthews reviews the decision and language of Mr. Justice Nel-
son in the case of Freeman v. Howe, and, speaking for the court, fully
approves the same.    He said:

"It has been sometimes said, that this statement was obiter dictum, and
not to be treated as the law of the case; but it was, in point of fact, a sub-
stantial part of the argument in support of the judgment, and, on considera-
tion, we feel bound to confirm it, in substance, as logically necessary to it.
For if we affirm, as that decision does, the exclusive right of the circuit
court in such a case to maintain the custody of property seized and held
under its process by its officers, and thus to take from owners wrongfully
deprived of possession the ordinary means of redress by suits for restitu-

tion in state courts, where any one may sue, without regard to citizenship, it is but common justice to furnish them with an equal and adequate remedy in the court itself which maintains control of the property; and as this may not be done by original suits, on account of the nature of the jurisdiction, as limited by differences of citizenship, it can only be accomplished by the exercise of the inherent and equitable powers of the court in ancillary and dependent proceedings incidental to the cause in which the property is held, so as to give to the claimant from whose possession it has been taken the opportunity to assert and enforce his right."

In Gumbel v. Pitkin, 124 U. S. 132, 8 Sup. Ct. 379, a United States marshal, by invalid process issued from a federal court, took possession of property. A sheriff sought to levy on the property by virtue of a lawful attachment for a state court, and left it with the marshal as garnishee. Subsequently the marshal sold the property under a valid process coming to his hands after the sheriff's attempt at garnishment. It was held that the plaintiff in the state attachment proceedings might intervene in the federal court, and be awarded the priority to which he would have been entitled had the sheriff been permitted to make an actual levy under his writ. Said Mr. Justice Matthews, in summing up the conclusion of the court:

"The case, therefore, stands thus: For the reasons growing out of the peculiar relation between federal and state courts exercising co-ordinate jurisdiction over the same territory, the circuit court acquired the exclusive jurisdiction to dispose of the property brought into its custody under color of its authority, although by illegal means, and to decide all questions of conflicting right thereto. The plaintiff in error, having pursued his remedy by action against his debtor in the state court, to which alone, by reason of citizenship, he could resort, attempted the levy of his writ of attachment upon the goods in the possession of the marshal. Not being allowed to withdraw from the marshal the actual possession of the property sought to be attached, he served upon the marshal notice of his writ as garnishee. Not being able by this process to subject the marshal to answer personally to the state court, he made himself a party to the proceedings in the circuit court, by its leave, and proceeded in that tribunal against its officer and the creditors for whom he had acted. On a regular trial it appeared as a fact that at the time of the notice the marshal was in possession of the property wrongfully, as an officer, and therefore chargeable as an individual. It was competent for the circuit court, and, having the power, it was its duty, to hold the marshal liable as garnishee; and having in its custody the fund arising from the sale of the property, and all the parties interested in it before it, that court was bound to do complete justice between all the parties, on the footing of these rights, and give to the plaintiff in error the priority over all other creditors to which, by virtue of his proceedings, and as prayed for in his petition of intervention, he was entitled."

The case most like the case at bar is that of Morgan's L. & T. Railroad & Steamship Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 11 Sup. Ct. 61. In this suit the complainant company, a citizen of Louisiana, filed a bill in a circuit court of the United States sitting in Texas against the Texas Central Railway Company, a citizen of Texas, against the Farmers' Loan & Trust Company, a citizen of New York, and the Metropolitan Trust Company, a citizen of New York, seeking to have certain debts owing by the Texas Central Railway Company to it declared a lien on the railroad of the railway company, prior in right to mortgages upon the same road held by the other

defendants the two trust companies. A receiver had been appointed in the original suit. Subsequently the Farmers' Loan & Trust Company filed its cross bill against the complainant and its codefendants, including the Metropolitan Trust Company. As the two trust companies were citizens of the same state,—New York,—the jurisdiction of the court could not be maintained to give relief on the cross bill, if it depended on diverse citizenship. Objection was taken to the action of the court in granting foreclosure upon the cross bill, but the objection was not sustained in the supreme court of the United States. Said the chief justice, on page 201, 137 U. S., and page 61, 11 Sup. Ct.:

"It may be that, so far as it sought the further aid of the court beyond the purposes of defense to the original bill, it was not a pure cross bill, but that is immaterial. The subject-matter was the same, although the complainant in the cross bill asserted rights to the property different from those allowed to it in the original bill, and claimed an affirmative decree upon those rights. A complete determination of the matters already in litigation could not have been obtained, except through a cross bill, and different relief from that prayed in the original bill would necessarily be sought. * * * *And whether this bill be regarded as a pure cross bill, as an original bill in the nature of a cross bill, or as an original bill,* there is no error calling for the disturbance of the decree because the court proceeded upon it in connection with the other pleadings. The jurisdiction of the circuit court did not depend upon the citizenship of the parties, but on the subject-matter in litigation. The property was in the actual possession of that court, and this drew to it the right to decide upon the conflicting claims to its ultimate possession and control."

The clause in the foregoing which we have italicized shows clearly that the ancillary jurisdiction of the federal court growing out of its possession of property may be invoked by original bill as well as by intervening petition.

Other cases to the same point are Trust Co. v. Bridges, 6 C. C. A. 539, 57 Fed. 753; Conwell v. Canal Co., 4 Biss. 195, Fed. Cas. No. 3,148; Carey v. Railway Co., 52 Fed. 671.

The bill of Knox and Jesup was therefore cognizable by the court below, as ancillary to the litigation in which the mortgage of the Central Trust Company and Cheney, trustees, was foreclosed. That, it will be remembered, was a consolidation of the insolvency bill filed by the Wabash, St. Louis & Pacific Railway Company against the Central Trust Company and others, and of the foreclosure bills of the Central Trust Company removed from the state court. Some claim is made that the federal court had no jurisdiction to entertain the insolvency bill, because such a proceeding was without precedent. Whether precedents in equity practice and jurisprudence justified the bill was for the decision of the court in which the bill was filed. It cannot be reviewed in this proceeding, which, while dependent on that, and ancillary to it, is collateral to it, in so far as to prevent an examination of the correctness of the orders and decrees made in it. Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787; Mellen v. Iron Works, 131 U. S. 352, 9 Sup. Ct. 781. The jurisdictional fact upon which the right of the court below to hear and determine the cause of action presented by Knox and Jesup's bill rested was the pending possession by that court's receivers of

the property sought to be sold in foreclosure. Johnson v. Christian, 125 U. S. 642–646, 8 Sup. Ct. 989, 1135. It was unnecessary to look further, for, even if the order under which that possession had been taken was irregular or erroneous, Gumbel v. Pitkin, Krippendorf v. Hyde, and Freeman v. Howe, cited above, all show that such possession would impose upon the court the duty, and would draw to it the jurisdictional power, of granting any relief requiring for its full measure the possession and control of the property.

It is further objected that the court below had no power to take possession of the railroad property by its receivers in 1884, pending the suit of Compton, in the common pleas court, to subject the property to the payment of his liens. The argument is that Compton's suit was in the nature of a proceeding in rem, which impounded the property, and excluded any other court from assuming actual possession of it. Heidritter v. Oil-Cloth Co., 112 U. S. 294, 5 Sup. Ct. 135, is cited in support of this proposition. That was an ejectment suit. The plaintiff claimed under a sheriff's deed executed to a purchaser at a judicial sale by order of a state court, in a proceeding to enforce a mechanic's lien against the premises in controversy. The defendant claimed under a marshal's deed executed to the purchaser at a judicial sale by order of a federal court, in a proceeding, under the internal revenue laws, to forfeit the premises because used for illegal distilling. When claims for the mechanics' liens were filed, and suits were brought to enforce the same, in accordance with the New Jersey statute, the premises were in the actual custody of the United States marshal, who had taken possession under process of attachment issued on an information to enforce a forfeiture, which resulted subsequently in a sale, and the deed under which defendant claimed. The sale under the proceedings in the state court took place a few days after that by the United States marshal. It was held that proceedings begun in the state court in the nature of proceedings in rem to subject the premises to sale were ineffectual to confer any legal title on a purchaser, if at the time they were begun the property was in the actual custody of the federal court for the purpose of a judicial sale by the latter court. It was not decided, however, that the proceedings in the state court might not be valid to establish the lien. The holding was expressly limited to the point that a deed under the state proceeding vested no legal title, as against the title conferred by the court first having actual custody of the property. It was the actual custody of the premises in the federal court which excluded the right of another court to entertain jurisdiction of a proceeding to subject the property thus removed from its control and disposition to a sale for the purpose of vesting a title superior to that which might be conferred by the federal court. Mere constructive possession would not have been enough to exclude possession by another court. In a conflict of jurisdictions, it is manifest that there can be no constructive possession by one court, where it cannot take actual possession, but it by no means follows that the constructive possession of one court will exclude the actual taking possession by another. For this reason, even if the proceeding in

the Lucas common pleas to establish Compton's lien was a proceeding in rem, it did not involve the actual seizure of the property pending the suit, and did not, therefore, prevent the federal court from taking actual possession of the property, through its receivers, in a proceeding to foreclose mortgages and other liens than Compton's. This objection to the jurisdiction of the court below over the Knox and Jesup bill cannot, therefore, be sustained.

We come now to the objection that, even if the jurisdiction of the bill be conceded, the court had no power to bring Compton before it. The argument is that the right of the federal court to grant relief to persons claiming an interest in property in its custody, without regard to their citizenship, is founded on its duty to prevent an abuse of its process to the prejudice of strangers to the suit, and is dependent on the wish of such strangers to secure that relief, expressed in an affirmative and voluntary appeal for the aid of the court, and that no power exists in the court to compel such a stranger to come into court, against his will, simply because he claims an interest in the property impounded, if his citizenship would prevent the issue of such process against him in the original suit. Let it be conceded, for the purpose of the argument, that the distinction made is a sound one. It does not help Compton. He was not brought into court to prevent prejudice to him by the federal court's possession of the res. He was brought into court to prevent prejudice to Knox and Jesup, who, otherwise having no right to invoke the action of the federal court, did so on the ground that its possession of the res prevented their getting full and adequate relief in the state tribunals, and who were therefore entitled to bring into the case every one whose presence as a party was necessary to give them such relief. They had the right to have the railroad sold free from all liens, so that the purchaser should have an unclouded title, and this could not be done without Compton's presence. Compton was not a resident of the district in which the court's ordinary process ran, and he could not be brought in by subpoena. Knox and Jesup's bill was, however, a proceeding against property in the jurisdiction of the court. It was competent for congress, in such a case, to provide for constructive service, which would bind the person against whom it issued to the extent only of the res which lay within the territorial jurisdiction of the court. Pennoyer v. Neff, 95 U. S. 714; Heidritter v. Oil-Cloth Co., 112 U. S. 294, 300, 301, 5 Sup. Ct. 135. Statutory provision of this kind is found in section 8 of the act of March 3, 1875 (18 Stat. 470), which was not repealed by the jurisdiction act of March 3, 1887 (24 Stat. 552), or of August 13, 1888 (25 Stat. 433), and is still in force. It provides:

"That when in any suit, commenced in any circuit court of the United States, to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to real or personal property within the district where such suit is brought, one or more of the defendants therein shall not be an inhabitant of or found within, the said district, or shall not voluntarily appear thereto, it shall be lawful for the court to make an order directing such absent defendant or defendants to appear, plead, answer, or demur, by a day certain to be designated which order shall be served on such absent defendant or defendants, if, practica-

ble, wherever found, and also upon the person or persons in possession or charge of said property, if any there be; or where such personal service upon such absent defendant or defendants is not practicable, such order shall be published in such manner as the court may direct, not less than once a week for six consecutive weeks; and in case such absent defendant shall not appear, plead, answer or demur within the time so limited, or within some further time to be allowed by the court, in its discretion, and upon proof of the service or publication of said order, and of the 'performance of the directions contained in the same, it shall be lawful for the court to entertain jurisdiction and proceed to the hearing and adjudication of such suit in the same manner as if such absent defendant had been served with process within the said district; but said adjudication shall, as regards said absent defendant or defendants without appearance, affect only the property which shall have been the subject of the suit and under the jurisdiction of the court therein, within such district."

The meaning of this statute is not doubtful. It applies to every suit of the kind mentioned in the section provided, only, the circuit court of the United States in which the proceeding is taken has otherwise jurisdiction of it. Whether it be a suit arising under the laws and constitution of the United States, or a suit to which the United States is a party, or a suit in which there is a controversy between citizens of different states, or a suit like the one at bar, of which the circuit court has jurisdiction indispensable and ancillary to its original jurisdiction, if it also satisfies the description of the statute, the process therein provided is available. The case of Brigham v. Luddington, 12 Blatchf. 237, Fed. Cas. No. 1,874, has nothing in it to conflict with this conclusion. In that case, Circuit Judge Woodruff refused to make an order for substituted process against the owner of the property, because he was a citizen of the same state as the complainant, and his presence as a party would oust the jurisdiction of the court. The bill was an original one, and the jurisdiction could only rest on diverse citizenship. In the suit at bar, Compton's presence as party defendant would not oust the jurisdiction of the court, because, as already shown, it is not dependent on diverse citizenship. The circuit court had jurisdiction of the cause otherwise than by virtue of the section above quoted. The suit was brought to enforce a legal and equitable lien on real estate lying in the district, and to remove the cloud of Compton's lien from the title of the purchaser at the foreclosure sale. Compton was therefore properly brought into court by the substituted or constructive process provided in the section above quoted. Farmers' Loan & Trust Co. v. Houston & T. C. Ry. Co., 44 Fed. 115; Greeley v. Lowe, 155 U. S. 58, 15 Sup. Ct. 24.

Having disposed of the jurisdictional objections to the decree below, we now come to consider the merits of the case. We fully concur with the court below in its holding that the decree in the Tysen or Ham suit in Indiana did not bind Compton, or prevent his pursuing his remedy in the court of Ohio, if he chose to do so. The bill in the Tysen suit only made parties to it those equipment bondholders who chose to come in and contribute to the expenses of it. Compton did not do either. The Ham decree was no bar to Compton's prosecuting the Ohio decree in his favor, for the reasons which

we quote from the opinion of the learned circuit judge in the court below:

"First, because he was not a party to that proceeding, and did not appear therein; second, because the Ham suit was not, in its inception, or at the time Compton commenced his action in the state court, such a class suit, or so representative in its character, as to bind him without his being or becoming an actual party thereto (Pom. Rem. & Rem. Rights [2d Ed.] 396–399); and, third, because, if the Ham suit had been so representative in its character as that the decree of the supreme court therein could or would have concluded said Compton on the question of the lien of the equipment bonds, neither the pendency of said suit, nor the decree of the supreme court was ever interposed by the defendants to his suit in the state courts, either by way of abatement, or in bar thereof, although ample time and opportunity so to do was afforded them. Grant v. Ludlow, 8 Ohio St. 1; Matthews v. Davis, 39 Ohio St. 55; Dimock v. Copper Co., 117 U. S. 560, 6 Sup. Ct. 855."

We come next to the question whether the Ohio divisional mortgages cover the Toledo terminal property. The facts appear in the statement of the case at length. The propositions of Compton's counsel are as follows: First. No property can be included in an after-acquired property clause in a railroad mortgage, except that which is acquired by the mortgagor or its successor in title by virtue of the franchises under which the mortgagor issued the mortgage. Second. The Toledo terminals were acquired by the Toledo & Wabash Railway Company, which, being a consolidated company of Ohio and Indiana, took them under new franchises, received directly from the state, and not under old franchises, received by assignment from its predecessors in title to the railroad. Therefore the terminals are not included in the after-acquired property clauses of mortgages executed by such predecessors. The extent of the property included in the grant of a mortgage by a railroad company depends on two questions: First, what property had it the power to mortgage? and, second, what property did it intend to mortgage? Section 3287 of the Revised Statutes of Ohio, in force at the time of the issuance of the divisional mortgages, permitted railroad companies of Ohio to issue bonds and notes, and to secure them by a pledge of their property and income. It was held by the supreme court of Ohio that the power to mortgage property and income included power to mortgage after-acquired real and personal property. "The pledge is to be all the property and income. The income intended must have been the future income, and was to be produced by property in possession, and to be acquired. If the future product can be conveyed, why not that by which it is credited?" Coe v. Railroad Co., 10 Ohio St. 372–393; Pennock v. Coe, 23 How. 117. We have no doubt that under these two decisions a railroad company authorized by its charter to build and operate a railroad between two named points would have the power to mortgage its road then built, or to be built by itself or by any successor in title to the same railroad, whether exercising the mortgagor's franchises, or similar franchises granted by the same sovereign. What is mortgaged is the property, and all accretions to the property possible within the limitations of the then charter; and it does not seem to

us material whether the successor in title to the railroad acquires such accretions under the same franchises as those under which the road was first projected and constructed, or under new franchises of the same effect and character. It may be conceded that under the decision of Shields v. Ohio, 95 U. S. 319, and other cases, the consolidated corporation acquired its franchises anew from the state, and not from its predecessors in title; but the acquisition of terminal property at Toledo was as much permitted under the franchises enjoyed by the divisional mortgagors as under those under which it was actually acquired, and such terminal property would have been as properly appurtenant to the Ohio Division as to the consolidated line. The right to mortgage after-acquired property is not necessarily dependent on the right to mortgage franchises. There is nothing in the case of Coe v. Railroad Co., or of Pennock v. Coe, to justify such a view. The supreme court of Ohio, as we have seen, based its decision that power existed to mortgage after-acquired property on the provision of the statute that property and income might be pledged. Indeed, under the Ohio statute, it is doubtful whether the company had any right to mortgage its franchises. The decision of the supreme court of the United States in Pennock v. Coe does not deal with the question of franchises, and does not make its conclusion in the case depend thereon. We are of opinion, therefore, that an Ohio railway corporation has the power to mortgage its railroad, and any subsequent accessions or accretions properly appurtenant thereto, acquired either by itself or any successor in title, whether the road be then maintained by virtue of the original franchises, or of franchises newly acquired from the state.

The question remains, therefore, what did the mortgagors intend to mortgage? Did they intend to limit the effect of the after-acquired property clauses to that which was acquired under their own franchises, or did they intend to make the clauses cover every addition and accession to the same railroad which they were constructing and operating, whether that railroad passed into the hands of a new company, with new franchises, or continued in operation under the then franchises? There can be no doubt of the intention of the parties upon this point. It was the road of the two mortgagor companies. made and to be made together, with the necessary depot grounds and depot buildings, erected and to be erected. What was the road? It was the road running from Toledo to the west line of Paulding county. No question can be made of its identity. It is not disputed that the Toledo terminal property here in question is a proper part of this railroad which the original Toledo & Illinois Railroad Company and its successors in title had full charter powers to build and operate. It was obviously the intention of each of the mortgagor companies that whatever was added to the railroad at each of the terminal points named for use as part of it should be embraced by the mortgage. Every person or company acquiring the railroad thus described. or any interest in it, from the mortgagor companies, took title subject to the mortgages thus construed, and, in making additions or accessions within the terms of the mortgage, was estopped by privity of title with the mortgagor companies

to deny that such accretions were subject to the mortgage lien. Railroad Co. v. Cowdrey, 11 Wall. 459–481. The mortgage of the Toledo & Wabash Railroad Company, the Ohio constituent of the Toledo & Wabash Railway Company, expressly recognized that the Toledo & Illinois mortgage—the first Ohio divisional mortgage—was a lien prior in right upon its road, constructed and to be constructed, and its terminal property, acquired and to be acquired; and upon that same property it imposed the lien of its own mortgage, as a second or junior lien to that of the Toledo & Illinois Railroad Company. In this junior mortgage the mortgagor makes reference to the probability of its consolidation with another company, and a few days thereafter, really as part of the same transaction, it made the agreement of consolidation which resulted in the Toledo & Wabash Railway Company. It certainly could not have intended that the after-acquired property clause in its mortgage was to have no effect except during the few days before it should be consolidated into the Toledo & Wabash Railway Company. Manifestly it intended that its mortgage should cover all the property acquired by the newly-consolidated company which would have been a legitimate accession to the railroad it proposed to contribute to the new company, had no consolidation taken place. It is immaterial what construction would have been put upon the first divisional mortgage (that of the Toledo & Illinois Railroad Company), standing alone. The second divisional mortgage expressly recognizes the lien of the first mortgage as covering the same property, acquired and to be acquired, which the second divisional mortgage covers. As the second divisional mortgage was necessarily intended to cover property acquired by the Toledo & Wabash Railway Company, the successors in title to the railroad are estopped to deny, by the recitals of the second mortgage, that the first mortgage did not cover the same property as the second. Hence our conclusion is that both divisional mortgages were intended to cover the legitimate accretions to the railroad running from Toledo to the Indiana line, properly appurtenant thereto. It is conceded that the Toledo terminals come within this description.

We next come to the form of relief to which Compton's decree entitled him in the court below. Whether the decree established in his favor an indivisible lien on the railroad extending from Toledo to the Illinois state line, or a lien on the Ohio Division only, it is certain that it was junior to the Ohio divisional mortgages, and also to the Indiana divisional mortgages, if it extended to Indiana. As Compton was properly made a party to the action of foreclosure by the divisional mortgagees, a sale in such a proceeding would ordinarily pass to the purchaser a title clear from Compton's lien, which would be transferred to the proceeds of sale, and would be satisfied out of what should remain after the satisfaction of the prior divisional mortgages. If the amount realized by the sale was not sufficient to pay the prior mortgages, Compton's lien would entitle him to nothing, but the railroad in the hands of the purchaser would nevertheless be forever discharged from its incumbrance. The record discloses that the amount realized at the sale from the Ohio Division

was not more than enough to pay the divisional mortgages, while the Indiana Division did not bring enough to pay in full its second divisional mortgage. Unless there was something in the decree for sale which held the railroad in the hands of the purchaser still subject to Compton's lien, his lien was foreclosed, and his remedies were exhausted by the sale. This brings us to the proper construction of the so-called "saving clause" in the decree. At the time the mortgagees were pressing the court below to order a sale, in March, 1889, it had just decided that Compton was properly brought into court, and that he must answer. The averments of the bill and cross bills which he was required to answer attacked the validity of his Ohio decree and the lien thereby declared, and the prayer was that he might be forever barred from enforcing either. The proposed decree for sale fixed the amount due on, and the priority of, every mortgage set up in the cause. The purchasing committee of reorganizing bondholders had, we may infer from the schedule of bonds afterwards deposited by them, as well as from their purchase of the road under the previous foreclosure, bonds of every class to enable them safely to make bids of large amounts, and to protect the interests of those whom they represented. Compton was an outsider, and, presumably, was not in the scheme of reorganization. He had no mortgage bonds with which to pay a substantial part of the purchase price. He must raise at least $2,500,000 in cash before he could bid even on the Ohio Division, and he could not save his lien except by a bid of $350,000 more. If his lien was invalid, he would have involved himself to the extent of $3,000,000 for no especial or certain benefit to himself. The purchasing committee, representing nearly all the bonds, with a plan of reorganization in which all bonds, of every class, would be represented, might make its bid low enough to exclude any proceeds available for Compton, and yet not injure the bondholders under mortgages subsequent to Compton's lien. It was necessary for him to bid to save anything, and yet he did not know that he had anything to save. Considering the great disadvantage that he would have been under in bidding to protect himself against so powerful a combination of bondholders, without certainty as to the validity of his own lien, it is not surprising that his counsel vigorously objected to a sale before his rights in the property should be determined. On the other hand, it was, of course, greatly for the advantage of the bondholders to have the road sold, and the expenses of the litigation and receivership ended. The court overruled Compton's objection, and ordered the sale; but to prevent the palpable injustice to Compton, which the circumstances would otherwise cause, the court inserted in the decree the saving clause under discussion. It may be conceded that it was within the legal discretion of the court below to order a sale before fixing all priorities, or settling the validity and place of any particular lien, and that, too, without any saving clause such as the one we have here. Bank v. Shedd, 121 U. S. 74, 7 Sup. Ct. 807; Mellen v. Iron Works, 131 U. S. 352, 9 Sup. Ct. 781. But, looking to the hardship to which Compton would be subjected by such an early sale, the court, while

making the order, very properly attempted to put Compton in a position where he would not suffer from a sale in advance of the decision of his rights. That this was the motive and intention of the court may be clearly inferred from the circumstances already stated, and from the language of the following recital in the decree, by which the saving clause is introduced:

"And the defendant James Compton having in open court, on the final hearing, objected to the rendering or entry of any decree in this cause at this time, on the ground that the issues raised by the amendment to the complainant's amended and supplemental ancillary bill, and to the cross bill of the cross complainants Solon Humphreys and Daniel A. Lindley, trustees, and the answers of the defendant James Compton, to be filed herein, have not been tried and determined, the court overruled such objection; and the defendant James Compton duly excepts to such ruling, and the entry of this decree. *But it is adjudged and decreed in the premises that the rendering and entry of this decree in advance of the trial and determination of such issues is upon and subject to the following conditions.*"

Express language could hardly be plainer than the implication from the foregoing italicized words that the clause about to follow was intended by the court to be a means of relieving Compton from the great disadvantage to which an early sale would subject him. In this light is the saving clause to be construed. The court said, in effect, to the mortgagees pressing for a sale, "the sale will be ordered, but as a condition, and for the purpose of preventing injustice to Compton, its effect shall be limited." Shortly stated, the first paragraph of the condition provides that if Compton's Ohio supreme court decree, and the lien therein adjudicated in his favor, are found to be in full force and effect, then, within 10 days from the decree in his favor, the purchaser or his successor in title shall pay the full amount of the lien, and "in default of such payment this court shall resume possession of the property covered and affected by the said lien of the defendant James Compton, and enforce such decree as it may render herein in his favor by resale of such property, or otherwise, as this court may direct." If this paragraph stood alone, it might well mean that the purchaser should take the property burdened with the Compton lien, if adjudged valid as a first lien, and that, in default of his paying it, the property should be sold again to satisfy it,—in this way giving it precedence over even prior mortgages. But the second paragraph clarifies the meaning of the first, and shows that the resale, if ordered, was to be a sale like the first, the proceeds of which would be applied to the mortgage and liens in the order of their priority. It provides, first, that, notwithstanding the sale, Compton's lien shall proceed to a decree which shall bind the purchaser at the sale in respect of any property affected by the lien. It provides, second, that nothing in the decree of sale shall be construed to be an adjudication against Compton, or "to prejudice, annul, or abridge any right, claim, or interest, or lien which the said James Compton may have in, to, or upon the premises hereby directed to be sold, or any part thereof, or in, to, or upon any property whatsoever embraced in this decree; it being the intention to hereby preserve the rights of said Compton in the relation in which he now stands towards the mortgagees, parties hereto." The purpose which

is manifest in the first paragraph, and which is made to appear again in the second paragraph, is that the person affected by this condition inserted to save .Compton's rights is the purchaser. It is he, or his successor in title, who is to pay the lien, or give up possession. It is he, or his successor in title, who is to be bound by the decree in Compton's favor. The inference is irresistible that Compton's lien was not to be transferred by the sale from the property to the proceeds of sale. Otherwise the purchaser could not be affected by the decree, for every obligation on his part would be discharged by paying and completing his bid. The further provision that nothing in the decree of sale was to be construed to prejudice, annul, or abridge any right or lien which Compton had in the property ordered sold is another assertion that the sale was not to disturb Compton's lien on the property. And the final clause only enforces the same purpose by declaring that Compton's rights were to be preserved in the relation in which he stood towards the mortgagees at the time the decree of sale was entered, and before the sale. Taking the two paragraphs together, it is reasonably clear that the court intended the purchaser to take the property subject to Compton's lien, and, in case the lien should be held valid, to have the option either of paying the lien off, or of permitting the court to resume possession, and enforce Compton's lien by such remedy as it should deem equitable, whether by resale or otherwise. If the purchaser should be of the opinion that a resale free from Compton's lien would bring enough more than the price at the first sale to pay the lien off, he would doubtless prefer to satisfy it, rather than to permit a resale, or even a redemption of the prior mortgages to which he would be subrogated. If, on the other hand, he should think that the price at a resale would not be increased over that at which he bought, in an amount sufficient to pay Compton's lien, he would doubtless exercise the option of permitting the court to resume possession, and to resell, or to decree a redemption. The purpose of the court was to give Compton the amount of his lien, or to restore to him the status quo ante, at the option of the purchaser. Compton's relation to the property covered by his lien was not intended to be changed by the early sale. If the lien was not paid, he was to have the same remedy against the purchaser which he would have had if he had not been a party to the suit. The purchaser would acquire all the rights of all the mortgagees whose mortgages were foreclosed, as well as those of the mortgagor, and Compton's remedy was to be such as equity would give him against the mortgagor and such mortgagees. The character of that remedy must be determined wholly apart from anything in the decree for sale, because the saving clause leaves it entirely in the judgment of the court. The enforcement of the lien is to be by resale or otherwise after the default and the resumption of possession by the court. It seems to be clear that the word "otherwise" is wide enough to include any other remedy than resale, suitable to the case. If redemption is such a remedy, the court was within the terms of the saving clause in granting it. Objection is made that it was not necessary, before decreeing redemption, for the court to resume possession of the property, and therefore that the

"otherwise" could not include such a remedy, because it must have referred to some remedy to afford which possession by the court was necessary. This is too narrow and literal a construction of the power reserved by the court. It would certainly not prevent a decree for redemption, if the court did take possession; and the provision that it should do so was not, therefore, inconsistent with a reservation of the power to make such a decree, if the court saw fit. In other words the saving clause simply remits us to the Ohio supreme court decree, to determine therefrom, by general rules of equity practice and jurisprudence, as they may be modified by local law, what relief should have been granted to Compton in the court below.

It is suggested for the first time in this court that the saving clause was not intended to prevent the transfer of Compton's lien from the property to the proceeds of sale, but that it was inserted merely to give the court power, in case Compton's lien should subsequently be held valid, to compel any purchaser who had paid his bid in bonds secured by subsequent and junior mortgages, as permitted by the decree, to replace the same with cash sufficient to pay Compton's lien, if the amount of the bid was large enough to leave a balance for application to that lien after satisfying prior mortgages. The decree for sale was approved by Judges Jackson and Gresham at Chicago, though it was formally signed by Judge Brown in the court below. Those judges certainly understood that Compton's lien remained on the property after the sale, and was not transferred to the proceeds, because otherwise they would have had no power to decree redemption in Compton's favor, as they subsequently did. The provision in the decree permitting payment of bids in bonds, at the option of the purchaser, was wholly inadequate as a reason for the insertion of so elaborate a saving clause. The provision was that there should be paid in cash, of the price at which the property should sell, in addition to an amount required as a deposit at the time of the sale, such further sum as the court might thereafter direct. "The remainder of such purchase price may be paid either in cash or in bonds, with overdue coupons thereto appertaining, at such proportion or value as the holders thereof would be entitled to receive thereon in case the purchase price were paid by the purchasers in cash." If the saving clause had been inserted in the decree to prevent injustice to Compton from this provision, it is impossible to explain why language was not used especially referring to the bond provision, and directing a substitution of cash for bonds by the purchaser. More than this, the purchaser was not obliged to pay in bonds. He was at liberty to pay cash, and yet the saving clause applies to every purchaser, whether he pays in cash or in bonds. Every purchaser was required to pay Compton's lien, or give up possession of the property to the court for a resale, or other remedy. If its purpose was as stated, why was not an exception introduced in favor of purchasers paying in cash? Take another instance, and the one which did occur, namely, that the bid should be paid partly by cash, and partly by first mortgage bonds conceded to be prior in right to Compton's lien. Compton, if remitted to the proceeds, could not

have complained of the use of such bonds to pay the purchase price, and yet the saving clause, in its terms, is just as applicable to such a purchaser as to one who deposited bonds secured by a mortgage junior to Compton's lien. More than this, there was ample provision for securing the payment in cash of so much of the proceeds as would belong to Compton in other parts of the decree, and the saving clause, as construed, was mere meaningless surplusage. All questions of the disposition of the proceeds arising from the sales under the decree were reserved for future adjustment. The jurisdiction of the court over the property sold, and its right to take possession of it, was continued, after delivery to the purchaser, until all claims allowed or to be allowed against the property of the defendant company should be paid. And, in the order directing execution of a deed and the delivery of possession, express provision was made for the substitution of cash for bonds deposited as the court might direct, and a retaking of possession on failure by the purchaser to comply. In fine, the reference of the saving clause to a possible injustice from the permission to pay in bonds is strained, and fails to satisfy its plain language. It wholly overlooks the plain purpose of the clause, so manifest in the recital, at its beginning, to save Compton from the very great hardships of a sale before his interest was judicially ascertained. The clause was a reservation of Compton's lien from the sale, and a retention of it on the property sold. The deed directed to be made by the masters conveyed all the title to the described railroad, of all the parties to the suit, "except as particularly reserved in and by said decree of foreclosure and sale."

Thus far, in this opinion, I have been expressing the views of the entire court. We are agreed that the saving clause of the decree secured to Compton the same right to enforce his lien as if he had not been a party to the proceedings. Judge LURTON and I are not able to agree upon the remedy which this construction of the saving clause of the decree should secure to Compton. Judge RICKS thinks that the questions upon which Judge LURTON and I differ are of sufficient importance and difficulty to require that they shall be certified to the supreme court, and therefore expresses no opinion upon them. In this conclusion the differing judges concur, and the questions will be certified. As it may be of some assistance to the supreme court to know the grounds of our difference, I now proceed to state my own views:

How may Compton enforce his lien in the court below? By resale of the Ohio Division, or by redemption of it, or by a redemption of the railroad from Toledo to the Illinois line, as decreed by the court below? These questions must be considered in three aspects: First, with respect to the rights of those who were parties to the Ohio decree; and, second, with respect to the rights of the Ohio divisional mortgagees; and, third, with respect to the rights of the Indiana divisional mortgagees. By virtue of the sale the assignee of the purchaser the Wabash Railroad Company acquired the rights of the Wabash, St. Louis & Pacific Railroad Company, and the mortgage rights of all the mortgagees whose mortgages were foreclosed in the

court below. And it may be conceded that the questions above suggested are to be treated exactly as if the parties were present in this cause, because the purchaser may assert the right of each.

As against those who were parties to the Ohio decree, Compton had the right to a sale of the Ohio property subject to the Ohio divisional mortgages. This was the relief accorded to him by the Ohio decree. I do not think they can be heard to object, after that decree, to Compton's working out his remedies against the Ohio Division. It is pressed upon us that to allow Compton to divide up the railroad, against which he has an indivisible lien, is most inequitable, and that no court of equity should lend its aid to accomplish such a result. The power of this court to withhold such relief, though secured by the Ohio decree, is asserted on the principle laid down in Lawrence Manuf'g Co. v. Janesville Cotton Mills, 138 U. S. 554, 11 Sup. Ct. 402, that, where the aid of a court of equity is invoked to enforce or "piece out" (as the phrase is) an incomplete decree of another or the same court, the court appealed to may examine the justice of the decree sought to be enforced, and refuse its aid, if it finds the decree inequitable, or may impose, as a condition of its granting relief, any variation or limitation with respect to the operation of the decree which justice and equity may require. The decision in the case cited seems to be rested chiefly on the fact that the previous decree therein sought to be enforced was a decree entered by consent of parties, and not by the adjudication of a court. But, conceding the soundness of the general principle, it has application only to bills in equity to carry a former decree into execution, where no ordinary process on such former decree will serve, because of the neglect of the parties to proceed on the decree promptly, and the embarrassment of their rights caused by subsequent events. Daniell, Ch. Prac. (4th Ed.) 1585. It is only the defendant in the new suit who can call the former decree in question. The plaintiff never can. Id. 1586; Robinson v. Robinson, 2 Ves. Sr. 225. The court exercises the power because the plaintiff is voluntarily seeking aid for a decree, and so it may impose its own conditions in granting it. But such a doctrine, it seems to me, has no application to a case like that of Compton, who was brought into the court below against his will, and compelled to set up his lien, and required to work out his rights in this jurisdiction on penalty of losing them. Under such circumstances, he is certainly entitled to rely on the full measure of his rights, as then defined and adjudged by the decree of a court, in enforcing which he did not voluntarily seek the court below to aid him, and which he would not have set up in the court below until required to do so on pain of forfeiting every benefit it secured him. Added to this, the mode by which the court below acquired jurisdiction of Compton and his claim suggests reasons of peculiar force for not abridging in the slightest degree the rights adjudged to be his in the Ohio decree. The jurisdiction, as already explained, is ancillary and unusual. It rests—First, on the necessity for avoiding conflicts between courts for possession and control of property; and, second, on the duty of courts to prevent an abuse of their process. When jurisdiction is thus assumed by federal courts over controversies

usually cognizable in state courts, there is a heavy obligation on the federal courts to secure to those thus deprived of the privilege of resorting to their ordinary state tribunals as near the same relief or remedy as they would have received in the state courts as circumstances permit. A striking recognition of this obligation by the supreme court of the United States may be found in the case of Gumbel v. Pitkin, 124 U. S. 132, 8 Sup. Ct. 379, the opinion in which, by Justice Matthews, has already been quoted from. It would be strange indeed if a jurisdiction asserted only because of the necessity of the case, and under extraordinary circumstances, could be used to bring in direct review before a circuit court of the United States a decree of the supreme court of a state. Had Compton never been made a party to the action below, he might have proceeded with execution of his decree, and bought in the interests of the parties to his action in the Ohio Division. He could not have taken possession of the property, because it was in the possession of the court below; but, having executed his decree in this wise, he might have then been made a party to the action below, or could have brought an independent action to redeem from the purchaser. In such a case certainly the other parties to his Ohio decree could not be heard to object to his enforcing a remedy against the Ohio Division alone. It is difficult to see why the execution of a decree fixing the rights of the parties should work any more of an estoppel than the decree itself.

It is next objected that the Ohio decree is not binding on the parties to it with reference to the appropriation of the Ohio Division to the payment of the equipment bonds, because in this respect the decree was not responsive to the issue raised between the parties. It is true that a decree or judgment is only res judicata in so far as it is responsive to the issues tendered by the pleadings, or to the matters which, by the record, appear to have been actually controverted. Reynolds v. Stockton, 140 U. S. 254, 11 Sup. Ct. 773. The Ohio decree is not open to this objection. The question at issue between the parties to the decree in the supreme court of Ohio was—First, whether Compton had a lien upon the property of the Toledo & Wabash Railroad Company, reaching from Toledo to the Illinois state line; and, secondly, how it could be enforced. The supreme court held that he had such a lien, and directed the Ohio property to be sold for its enforcement. The prayer of Compton was for the enforcement of his lien by the sale of the whole railroad. If he asked for a sale of the whole property, the court had the right to enforce in his favor that remedy, or any remedy less than that which it thought just and proper. It was therefore within its jurisdiction, as invoked by Compton's prayer, to take so much of the property on which it declared the lien to exist as, in equity, it thought it had the right to take. It took that over which it had territorial jurisdiction. See opinion of court in 45 Ohio St. 592, 623, 16 N. E. 110, and 18 N. E. 380. Whether it erred in this, neither the court below nor this court is vested with the power to decide. It is true that the record does not show that any formal issue was made with reference to the amount of property to be sold to pay the lien, but

this can make no difference. The court was bound, before it made an operative decree, to specify the property to be sold to pay the lien (Railroad Co. v. Swasey, 23 Wall. 405), and it was plainly within its power to subject less than that prayed for by the plaintiff to such a sale. The parties were present in court, and might have objected to this form of remedy. Whether they did so, or not, the granting of the remedy, being within the prayer of Compton, was a binding and conclusive adjudication upon the parties in court that such a remedy was proper. This is identically the same issue and cause of action which was in the supreme court of Ohio, and therefore no objection can be made or entertained by the court below, or by this court, to the form of relief there granted, which was or might have been made in the court entering the decree. In Cromwell v. County of Sac, 94 U. S. 351, Mr. Justice Field used this language:

"In considering the operation of this judgment, it should be borne in mind, as stated by counsel, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. Thus, for example, a judgment rendered upon a promissory note is conclusive as to the validity of the instrument and the amount due upon it, although it be subsequently alleged that perfect defenses actually existed, of which no proof was offered, such as forgery, want of consideration, or payment. If such defenses were not presented in the action, and established by competent evidence, the subsequent allegation of their existence is of no legal consequence. The judgment is as conclusive, so far as future proceedings at law are concerned, as though the defenses never existed."

The same principle is laid down in many cases. Stout v. Lye, 103 U. S. 66; Dimock v. Copper Co., 117 U. S. 559, 6 Sup. Ct. 855.

It is further suggested that the order of sale against the Ohio property was mere process to carry out the decree, and was not an adjudication which, when the decree is pleaded in another court, can be used to secure the same remedy afforded in the Ohio court. Such a contention is untenable. The decree for sale was the operative part. It was the court's act. All previous to that was mere declaration or finding, upon which the justice of the court's act was founded. It was within the power of the court to compel a sale of the entire line affected by the lien. So far as the Indiana property was concerned, it might have enforced a sale by compelling the defendant company to convey to the purchaser at its judicial sale. Instead of doing this, it ordered a sale of the Ohio property alone. This required judicial action. In Hill v. Bank, 97 U. S. 450, a trustee under a power of sale sold real estate separate from water power and paper-mill machinery. A bill was filed by the debtor to set the sale aside. This was done on the ground that the realty, the water power, and paper-mill machinery should be sold as an entirety, and the sale was set aside. Thereupon a bill was filed against the debtor to enforce the payment of the amount in default, and the court below

directed that the property should be sold as an entirety. In the supreme court, error was assigned that the court sold as an entirety, and it was held that the error could not be sustained, because the point was res adjudicata. Said the court:

"The decree upon the points in issue, and decided, is as binding upon the parties as a judgment or decree would be in any other case."

It is manifest from this case that the question how large a part of the property involved shall be sold to pay a lien is as clearly the subject of res judicata as the decision of any other right. The amount of the property to be sold under a decree in equity is one of the essential adjudications of the court, and is conclusive on the parties. In Railroad Co. v. Swasey, 23 Wall. 405, the question was whether a decree was final, or not, so as to permit an appeal. The action was to subject stock pledged to secure bonds to the payment of unpaid interest; and the court entered the decree appealed from, declaring that the stock must be sold for the purpose, and referring to a master the question what proportion of the stock was equitably applicable. Chief Justice Waite said (page 409):

"An appeal may be taken from a decree of foreclosure and sale when the rights of the parties have all been settled, and nothing remains to be done by the court but to make the sale, and pay out the proceeds. This has long been settled. The sale is the execution of the decree. By means of it the rights of the parties, as settled, are enforced. But to justify such a sale, without consent, the amount due upon the debt must be determined, and the property to be sold ascertained and defined. Until this is done the rights of the parties are not all settled. Final process for the collection of money cannot issue until the amount to be paid or collected by the process, if not paid, has been adjudged. So, too, process for the sale of specific property cannot issue until the property to be sold has been judicially identified. Such adjudications require the action of the court. A reference to a master to ascertain and report the facts is not sufficient. A master's report settles no rights. Its office is to present the case to the court in such a manner that intelligent action may be there had, and it is this action by the court, not the report, that finally determines the rights of the parties."

In Winter v. Eckert, 93 N. Y. 367, in a suit to settle up a partnership, a judgment had been entered directing the sale of partnership property, consisting of the stock and good will of a brewery business, horses and wagons, etc., by public auction, at public auction rooms. The sale was made in accordance with the judgment, and the sale was confirmed. The order confirming the sale was appealed from, but not the judgment ordering it. In affirming the action of the court below, the court of appeals rested its decision on the binding effect of the provisions of the judgment with reference to the mode of conducting the sale. Ruger, C. J., said:

"This judgment remains in full force as a binding adjudication upon all parties to the action, and conclusively determines, as between them, not only the necessity and propriety of, but the place and manner of, a sale of the property, including the conjunctive sale of the real and personal property therein described at a place where the presence of the personal property on such sale was entirely impracticable."

It therefore follows that as against the Wabash, St. Louis & Pacific Railway Company, the defendant company below, the successor in title of the mortgagors in the various mortgages foreclosed

below, as well as against Humphreys and Lindley, trustees, and Knox and Jesup, trustees, and all other mortgagees whose liens are junior to that of Compton, the decree of the Ohio supreme court establishes conclusively that Compton has a lien on the railroad of the Toledo & Wabash Railway Company, which may be enforced against the Ohio Division alone, without regard to his remedy against the Indiana Division. But it is said that under the present circumstances a sale subject to the divisional mortgages is impossible, and that any relief which is granted must include a disposition of Compton's rights with reference to those mortgages. This may be true, but it does not destroy the force and effect of the judicial determination that, so far as the parties to the Ohio decree were concerned, Compton has the right to enforce his remedy by sale or redemption against the Ohio Division. The decree for sale of the Ohio Division subject to the divisional mortgages necessarily carried with it, so far, at least, as the parties to the suit were concerned, the right on Compton's part, or on the part of the purchaser at such a sale, to redeem the divisional mortgages. They, in any event, cannot be heard to urge that Compton should be compelled, in the enforcement of his lien, either by sale or redemption, to resort to the entire line.

It remains to consider, therefore, whether a resale can be decreed as against the Ohio divisional mortgagees. They were not parties to the Ohio decree, and are therefore not bound by it. The ordinary equitable rule is that the junior mortgagee cannot compel the sale of the premises free from the lien of the senior mortgage, against the consent of the senior mortgagee, but that his only remedy is to redeem the senior mortgage. It has been urged upon us, however, that in Ohio, by statute and decision, it has become a rule of property that a junior mortgagee of real estate need not redeem a senior mortgage, but may bring an action for foreclosure, make the senior mortgagee party, sell the premises free of all liens, and compel the senior mortgagee to look to the proceeds of sale for the payment of his debt. Stewart v. Johnson, 30 Ohio St. 24; section 5316, Rev. St. Ohio. Even if we concede that this rule has application to the foreclosure of railroads, and to liens other than mortgages, though the statute in terms applies to mortgages on real estate only, nevertheless I think that the peculiar circumstances of this case require that we shall not order a resale. Compton's lien, as it was decreed by the supreme court of Ohio, arose from the merger, by consolidation, of the Toledo & Wabash Railway Company in the Toledo, Wabash & Western Railway Company. The same Ohio decree declared a lien in favor of the holders of all the remaining equipment bonds not held by Compton, and the same reasoning would establish a lien in favor of every unpaid creditor of the constituent railroad company. These liens are of equal priority with Compton's, and depend on the same act of the original creditor. They can be equitably satisfied only by dividing the benefit of the security ratably between them. Justice both to others interested in the property, and to the co-lienholders themselves, would seem to require that all the co-lienholders should be parties to an action

to enforce the lien of any one of them, and that the decree should provide proper relief for all of them. The relation between the lien of Compton and that of the other bondholders and creditors of the Toledo & Wabash Railroad Company is not very different from that between those of the bondholders in the case of Canal Co. v. Peers, 2 Black, 448, or that between the liens of the creditors of the insolvent corporations in Sawyer v. Hoag, 17 Wall. 610, 622; Patterson v. Lynde, 106 U. S. 519, 1 Sup. Ct. 432; and Johnson v. Waters, 111 U. S. 640, 644, 4 Sup. Ct. 619,—and in all those cases, a suit for the benefit of the whole class of creditors was held to be necessary. See Handley v. Stutz, 137 U. S. 366, 369, 11 Sup. Ct. 117. Now, it is true that Compton's decree in the Ohio supreme court estops the parties to it from objecting to the relief which that decree gives him on the ground that he should have brought his suit as a class suit, and joined all his co-lienholders, but the Ohio divisional mortgagees were not parties to that decree. They may, therefore, properly be heard to object to a resale of the Ohio Division at their risk, if, on equitable grounds, it should not be permitted. From the cases cited above, I feel convinced that, even if the Ohio statute would otherwise apply, the relation of Compton's lien to those of his co-lienholders is such that a foreclosure and sale should not be had, except in a suit for the benefit of all, and that the prior mortgagees have a direct interest and right to make this objection. If a sale is ordered on Compton's lien without the presence of the other co-lienholders, then the title to be conveyed to the purchaser must be subject to their liens, of uncertain amount. This fact will, of course, impede the sale, and reduce the price bid. It was Compton's duty to have brought either a representative suit, or to have made his co-lienholders parties, if he wished a sale free from all liens. He did neither. It would be unjust to the assignee of the prior mortgages to send the case back for the purpose of bringing in other parties, or to permit Compton to change the form of his pleadings, when we can give him by redemption all the relief that he can equitably ask in the absence of his co-lienholders. Not being in a position where he can ask a foreclosure and sale against the mortgagees, we may, if Compton states a case for it, treat his prayer for general relief as a prayer for a decree for redemption. Hudnit v. Nash, 16 N. J. Eq. 550. It is well settled that the tenant in common of an equity of redemption has the right to redeem the mortgage to protect his own interest by paying the full amount due thereon. 1 Jones, Mortg. § 1063, and cases cited. Either before or after thus redeeming the entire mortgage, he may call on his cotenants to contribute to the expenses of redemption, and on their failure to do so he may foreclose and bar their liens. Young v. Williams, 17 Conn. 393; Seymour v. Davis, 35 Conn. 264; McLaughlin v. Curts, 27 Wis. 644; Crafts v. Crafts, 13 Gray, 260.

Though, for the reasons given, I do not think Compton may have a resale of the Ohio Division, it seems clear to me that he may redeem it by paying to the purchaser, the Wabash Railroad Company, the amount due on the Ohio divisional mortgages. As against all the parties to his Ohio suit, he may exercise this right, because it was incident

to the relief granted in the Ohio decree, to wit, the sale of the Ohio Division subject to those mortgages. This prevents objection from the purchaser as assignee of the rights either of the defendant corporation, the Wabash, St. Louis & Pacific Railway Company, or of all the mortgagees with liens junior to Compton's, or of the Wabash Railway Company, and the Toledo, Wabash & Western Railway Company, predecessors in title of the defendant, for these were all parties to the Ohio decree. As the assignee of the rights of what party to the cause below can the purchaser object to the redemption of the Ohio divisional mortgages? Have the Ohio mortgagees a right to object? It is difficult to see how they can complain if their debts are paid in full, as they must be if Compton shall redeem. All that they can require before submitting to redemption is that Compton shall have acquired an interest in the equity of redemption. The owner of the equity when this suit was brought was the Wabash, St. Louis & Pacific Railway Company. The Ohio decree established that, as against that company, Compton had obtained an interest in the equity from the Toledo & Wabash Railway Company, one of its predecessors in title, and the immediate grantee of the mortgagor Ohio companies. The Ohio mortgagees cannot dispute this transfer of an interest in the equity of redemption to Compton. When a mortgage is given, the mortgagor does not thereby restrict his right to convey or incumber the equity of redemption in him. 1 Jones, Mortg. 676; Hodson v. Treat, 7 Wis. 263; Flanagan v. Westcott, 11 N. J. Eq. 264. It therefore follows that conveyances or decrees binding upon the original mortgagor or his privies with reference to the ownership of the equity of redemption, or an interest in it, are, with reference to the mortgagee, res inter alios acta, which he has no right or concern to impeach or dispute. Barney v. Patterson, 6 Har. & J. 182, 203; Gregg v. Forsyth, 24 How. 179; Secrist v. Green, 3 Wall. 744; Baylor's Lessee v. Dejarnette, 13 Grat. 152; Taylor v. Phelps, 1 Har. & G. 492, 503. Other illustrations of the same principle may be found in Candee v. Lord, 2 N. Y. 269; Raymond v. Richmond, 78 N. Y. 351; Pray v. Hegeman, 98 N. Y. 351; Curtis v. Leavitt, 15 N. Y. 51; Hall v. Stryker, 27 N. Y. 596; Way v. Lewis, 115 Mass. 26; Swihart v. Shaum, 24 Ohio St. 432; Wingate v. Haywood, 40 N. H. 437; Inman v. Mead, 97 Mass. 310; Brigham v. Fayerweather, 140 Mass. 411, 413, 5 N. E. 265; Cincinnati v. Deikmeier, 31 Ohio St. 242. In other words, if the mortgagor railroad company had the right itself, at the time the lien of the equipment bondholders attached to its property, to redeem the Ohio divisional mortgages without redeeming the Indiana mortgages, it had the right to convey it to some one else; and whether, by the act of issuing the bonds and the consolidation, it did convey such right to the equipment bondholders, is a question to be settled between the mortgagor railroad company and its successor in title, on the one hand, and the equipment bondholders on the other, without regard to the wish or consent of the prior mortgagees. The Ohio decree is a conclusive settlement of the question, and cannot be disturbed or attacked by the divisional mortgagees.

It is strongly urged, against the views that the Ohio mortgagees may not object to a redemption of their mortgages alone, that the mortgagees in the Indiana divisional mortgages are the same as in the Ohio divisional mortgages, namely, the Farmers' Loan & Trust Company in the first two divisional mortgages, and E. D. Morgan in the second two, and that it is a general equitable principle that where two mortgages in default are held by the same party, as mortgagee or assignee, equity will not decree redemption of one unless it be accompanied by redemption of the other, on the same piece of property. I think that this principle no longer obtains in this country; that it is, in its last analysis, the basis for the English doctrine of tacking mortgages, which has been pronounced to be harsh, and unsuited to our jurisprudence. But I do not find it necessary to discuss the question whether this rule is sound, or not, because, in my view, it has no application whatever to the case at bar. It is true that the Farmers' Loan & Trust Company is the trustee in an Ohio divisional mortgage, and is also a trustee in an Indiana divisional mortgage, but it is not true that the mortgagee in those mortgages is the same. The Farmers' Loan & Trust Company, in each mortgage, is trustee for certain bondholders, but there is no evidence whatever to show that the bondholders under one mortgage are the same as the bondholders under the other. Therefore the real parties in interest in the two mortgages are not the same, and therefore even the strict and inequitable rule with reference to tacking mortgages in England would not apply to such a case. E. D. Morgan, as trustee for one set of bondholders, has no power to assert the rights of other bondholders, for whom, in another mortgage, he is also acting as trustee. It is not a union of the two securities and the two titles in the same person. John Smith, as trustee for John Jones, is not the same person, in law, as John Smith the trustee for John Robinson. The title conferred by the mortgage is held in two different capacities. The rights of the one cannot be made to inure to the other. It therefore follows that this case is to be treated exactly as if the mortgagees in both the Indiana divisional mortgages were different from those named in the Ohio mortgages.

A second ground most forcibly stated for denying the right of Compton to redeem the Ohio divisional mortgages without also redeeming the Indiana mortgages is based on a theory of suretyship. It is said that each company which acquired title to the road by assuming the mortgage obligations became, with reference to the debt under the divisional mortgages, the principal debtor, and, there being no novation of the debts, the grantor corporation remained bound as surety; that the succeeding corporation having promised to pay all the mortgages, as the consideration for the purchase, the grantor corporation had the right to object to a partial discharge of this obligation, and to insist, as surety, that after default the right of redemption could not be exercised, except by a redemption of all the mortgages, payment of which in a single promise had been assumed as a consideration for the purchase. In this wise it is said the Ohio divisional mortgages and the Indiana

divisional mortgages were so united by successive assumptions of the obligations declared on them that now a redemption of the former without the latter cannot be permitted. There are several reasons why the principle relied on, even if it be a sound one, has, in my opinion, no application to the case at bar. In the first place, the objection, if otherwise tenable, could only be made by one of the so-called surety corporations. Of these, the Toledo, Wabash & Western Railway Company and the Wabash Railway Company were parties to Compton's Ohio decree; and this, for reasons already given, prevents them from objecting to his enforcing his lien against the Ohio Division alone. Again, neither of them, nor the Toledo & Wabash Railway Company, the first consolidated company, is a party to this action, and it is difficult to see how the objecting purchaser, who never acquired anything but the rights of the Wabash, St. Louis & Pacific Railway Company, the defendant company below, can use the surety rights of predecessors in title to the Wabash, St. Louis & Pacific Railway Company, which that company never acquired, and could never assert. But let us suppose that the Toledo & Wabash Railway Company were a party objecting. Even by it the objection suggested could not be made. It was the first corporation which united the Ohio and Indiana roads. That was the consolidation of the Toledo & Wabash Railroad Company, of Ohio, and the Wabash & Western Railway Company, of Indiana. At the time of the consolidation the two Ohio divisional mortgages were the obligation of the Toledo & Wabash Railroad Company, of Ohio, while the Indiana divisional mortgages were the obligation of the Wabash & Western Railroad Company, of Indiana. The consideration for the consolidation was a guaranty made by the Toledo & Wabash Railway Company to the Toledo & Wabash Railroad Company, that it would pay the Ohio divisional mortgages, and another guaranty by the same consolidated company, moving to the Wabash & Western Railroad Company, that it would pay the Indiana divisional mortgages. The promises in these two guaranties were different, and it therefore, of course, was within the power of the Toledo & Wabash Railway Company, the consolidated corporation, to fulfill its promise to its Ohio constituent by redeeming the Ohio divisional mortgages, without regard to the Indiana divisional mortgages. The Toledo & Wabash Railway Company had made no promise to its Indiana constituent that it would pay the Ohio divisional mortgages, and therefore the Indiana constituent had no right to object to a redemption of the one without the other. The Ohio constituent was not a surety for the payment of the Indiana divisional mortgages, nor was the Indiana constituent a surety for the payment of the Ohio divisional mortgages. It seems to me clearly to follow, therefore, that the Toledo & Wabash Railway Company had the right, in equity, to redeem the Ohio divisional mortgages without redemption of the Indiana divisional mortgages, because by no single promise of it to the same promisee had it united its obligations to pay the four divisional mortgages. One of the authorities relied on to support this suretyship argument is Wells v. Tucker, 57 Vt. 223. The case is not very well reported, but, so far as its facts are stated, it appears to

have been an action by the successor in title of the purchaser of a farm to redeem the same from a mortgage on an undivided one-half of the farm, without redeeming a mortgage on the other half. The purchaser had stipulated, as part of the purchase price, to pay both mortgages. The vendor was a party to the action to redeem, and he objected to the redemption of one mortgage without the other. It was held that, as to the vendor, the agreement by the vendee to pay both mortgages to relieve the vendor from liability was single and indivisible, and that, in his position as surety for the payment of both mortgages, the vendor could insist that both should be discharged at the same time. Whether this case can be supported, or not, its ratio decidendi has no application to the question whether the Toledo & Wabash Railway Company, the first consolidated company, could redeem the mortgages on the Ohio Division without redeeming those on the Indiana Division, because there were two different vendors, and the assumption of the Ohio mortgages was a promise made to one of them, and that of the Indiana mortgages was a different promise made to the other. There was therefore no person to whom a single promise was made, involving the assumption of the entire debt under the four mortgages. The mortgages continued to be liens on those divisions which, by their terms, they respectively covered; and the agreements to assume were made to the two constituents respectively and separately, and not to them jointly and unitedly. If the Toledo & Wabash Railway Company had the right, therefore, to redeem the Ohio divisional mortgages separately from the Indiana divisional mortgages, without the violation of any promise made to its constituent companies, then it certainly had the right to transfer these separate equities of redemption in the two divisions to whomsoever it might choose. 3 Jones, Mortg. 676; Hodson v. Treat, 7 Wis. 263; Flanagan v. Westcott, 11 N. J. Eq. 264. The equipment bonds were issued by the Toledo & Wabash Railway Company. By reason of its act in transferring all its assets to the Toledo, Wabash & Western Railway, and the effect of the Ohio statute of consolidation, the debt created by the equipment bonds became a lien on the separate equities of redemption which the Toledo & Wabash Railway Company held under the Ohio and Indiana divisional mortgages. It is true that the Toledo, Wabash & Western Railway Company made a single promise, in the agreement of consolidation, to pay all the indebtedness owing by the Toledo & Wabash Railway Company, and this included the two Indiana divisional mortgages, the two Ohio divisional mortgages, and the equipment bonds, as well as all other debts which the Toledo & Wabash Railway Company had not paid. But it was not by virtue of this promise that a lien passed to the equipment bondholders. It was by virtue of the act of the Toledo & Wabash Railway Company in transferring all its assets to the consolidated company, and the lien arose by that act, without regard to the promise which the new consolidated company made as the basis of the new consolidation. The equities of redemption upon which the equipment bondholders obtained their lien were the

separable equities of redemption owned by the Toledo & Wabash Railway Company, and not the united or single equity of redemption which the Toledo, Wabash & Western Railway Company acquired by virtue of the consolidation. All the consolidated corporations, from the Toledo, Wabash & Western Railway Company down to the defendant below, the Wabash, St. Louis & Pacific Railway Company, were parties to the Ohio decree. That decree settled the right of Compton to resort for the satisfaction of his lien to the Ohio Division alone. Incident to that remedy and relief, and neces-, sary to it, followed the right to redeem the Ohio divisional mortgages, and no party to the Ohio decree can now be heard to object to the enjoyment of that remedy by Compton.

But it is said that the same theory, upon which a lien attached in favor of the equipment bonds held by Compton, secured to the Indiana divisional bondholders a similar lien on the entire property of the Toledo & Wabash Railway Company, the constituent of the Toledo, Wabash & Western Railway Company, and therefore that the Indiana mortgagees have the right to object to a division of their security which covers the entire road. There are several reasons why this objection is untenable:

First. It was not by virtue of the sale in the court below that the purchaser became the equitable assignee of the rights of the Indiana bondholders under their mortgage and otherwise, and therefore he cannot represent them on this appeal. In the suit in the court below, the Farmers' Trust Company and James F. Joy were parties in a trust capacity, representing, not the Indiana bondholders, but the bondholders under the Ohio mortgages. Under the averments of the bills and cross bills, they were not proper parties to the Ohio suit, because, by virtue of the mortgages, they had no interest in the Ohio property. It is true that, by an error of his counsel in the court below, Joy filed in the court below the same answer as he did in the Indiana suit for the Indiana bondholders; but the error was a palpable one, and the subsequent act of the court, as well as the averments of the bills by which he was made a party below, show that he was only a party as trustee for the Ohio bondholders. It is true that an omnibus decree in the same language was entered in each of the three federal courts of Northern Ohio, Indiana, and Southern Illinois, but it was only operative in each court to foreclose and adjudicate liens on the property of the defendant company within the territorial jurisdiction of that court. No attempt was made by decree to compel conveyances from the mortgagor company to the purchaser of property lying outside the territorial jurisdiction of the court. That a court has the power, when it has personal jurisdiction over the mortgagor, to foreclose the mortgage on property lying outside of its territorial jurisdiction, is plain, and is fully established by the case of Muller v. Dows, 94 U. S. 444, but it must exercise this power by a decree against the person compelling the mortgagor to convey the equity of redemption. Otherwise the decree is inoperative. Carpenter v. Strange, 141 U. S. 87, 106, 11 Sup. Ct. 960. No such decree was

made by the court below, and no such relief was prayed by the parties. By the decree in each court, and the deed of the masters made in pursuance thereof, the purchaser took title to the part of the railroad in the territorial jurisdiction of that court. It is, of course, convenient to have foreclosure suits which involve a railroad traversing three states proceed together, and the different courts may make their decrees similar, and order a joint sale; but the suits are separate suits, and affect different pieces of property, and the parties to one suit do not, ipso facto, become parties to the other two. Mercantile Trust Co. v. Kanawha & O. Ry. Co., 39 Fed. 337; Toland v. Sprague, 12 Pet. 300, 327; Northern Indiana R. Co. v. Michigan Cent. R. Co., 15 How. 233, 242. Distributing, therefore, so much of the decree for sale, as it appears in the record, to each of the circuit courts where it belongs and is operative, it may properly be said that the mortgagees under the Indiana divisional mortgages were not parties to this suit in the court below, and are not parties to this appeal. Now, the purchaser at a judicial sale becomes a party to the record, for certain purposes; and he may appeal from a decree of the court below affecting his interests as purchaser, but he cannot dispute the correctness of the decree of sale under which he bought. That binds him conclusively. Blossom v. Railroad Co., 1 Wall. 655; Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 10 Sup. Ct. 736; Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950; Swann v. Wright's Ex'rs, 110 U. S. 590, 4 Sup. Ct. 235; Swann v. Clark, 110 U. S. 602, 4 Sup. Ct. 241. The only ground for giving him the position of a party is that he may protect his rights as a purchaser by the decree. If the Indiana mortgagees were not parties to the suit in the court below, it is perfectly obvious that the purchaser under the decree for sale and its confirmation acquired nothing of their rights, as mortgagees or otherwise. Therefore he cannot be heard to assert those rights on this appeal. It is wholly immaterial that in another suit in another court in another jurisdiction he has become the owner or equitable assignee of those Indiana mortgages. In his capacity as purchaser and quasi party in this suit, and on this appeal, he cannot be permitted to assert any rights under them.

Second. But suppose that it be admitted that the Indiana mortgagees were parties to the suit in the court below, and that the decree for sale did operate to foreclose their mortgages, so that the purchaser became by the sale the equitable assignee of those mortgages. It still does not follow that the purchaser may assert a different lien from that secured by the mortgage, and arising from an entirely different state of facts, extraneous to the mortgage. The purchaser at the sale below became the equitable assignee of every mortgage or other lien set up, and foreclosed by the decree for sale. Brobst v. Brock, 10 Wall. 519; Childs v. Childs, 10 Ohio St. 339; Stark v. Brown, 12 Wis. 638, 652; Johnson v. Sandhoff, 30 Minn. 197, 14 N. W. 889; Brewer v. Nash, 16 R. I. 462, 17 Atl. 857. The rule is generally applied in cases where, for some reason, the sale is ineffective to carry the whole title to the property. The

reason for it is best explained by the supreme court of Rhode Island in the opinion in the case last above cited, where, after a reference to all the authorities, the court says:

"The grounds of decision are not very fully developed in these cases, but it seems to us that the true ground is this: That while, ordinarily, a stranger to the estate, who voluntarily pays off a mortgage thereon, is not entitled to subrogation to the rights of the mortgagee, a purchaser at the mortgagee's sale, even when the sale is void, is not to be regarded as a mere stranger; but that having bid off the estate, in good faith, on the invitation of the mortgagee to do so, when, supposing his bid to have been effectual to invest him with the equitable or executory title, he pays the amount of his bid, and the same is applied to the mortgage debt, he has a most persuasive equity to be subrogated to at least the rights of the mortgagee who invited his confidence. In such a case the court does simply what the mortgagee would be bound to do himself, if he could, when it treats the purchaser as the assignee of the mortgagee."

The sole basis for giving effect to such an equitable assignment of liens in favor of a purchaser disappears in a case where a lien, though it exists in favor of a party, is neither set up in the pleadings, nor, by the terms of the decree, foreclosed. Of course, the purchase money paid could not be applied to the payment of such a lien, and in no way could the assignment by estoppel be worked out. It is true that if a party defendant, after being required by prayer of complainant to set up such lien as he claimed, failed to do so, he might be thereafter barred from ever again seeking to enforce it. Hefner v. Insurance Co., 123 U. S. 747, 8 Sup. Ct. 337. But this is quite a different result from a transfer to the purchaser of a right to assert affirmatively such a lien against a third person not a party to the suit. In the one case, the lienholder waives his lien; in the other, when he claims part of the purchase money he enforces it. The waiver is not more to the advantage of the purchaser than of every one else interested in the property. By sharing or claiming a share in the proceeds of sale, he does that which ought, in equity, to work an assignment of his lien to the purchaser who pays the purchase price. In the case at bar the mortgages of the Indiana mortgagees, of course, passed by equitable assignment in the Indiana suit to the purchaser, because they were there set up and foreclosed, and the purchase money was distributed to both of them. But those mortgagees never set up any lien on the Ohio property by virtue of the consolidation. If they had any such lien, they waived it, and the lien is as if it never was. The waiver is as much in Compton's behalf as in that of the purchaser. It is too late, therefore, for either the purchaser or the Indiana mortgagees, if they are to be considered parties to this appeal, to base on such a lien an objection to Compton's remedy against the Ohio Division for the enforcement of his lien.

Third. But, even if the Indiana mortgagees were present at the bar, they could present no valid objection to Compton's redemption of the Ohio Division. As already explained, the lien which inured to them and to Compton by the merger of the Toledo & Wabash Railway Company in the Toledo, Wabash & Western Railway Company was a lien on the separate and separable equities of redemption

held by that company; and, as it might have separately redeemed, so might they, or either of them, redeem for the benefit of themselves and others similarly situated.

Fourth. The Indiana mortgagees have a mortgage lien on the Indiana Division, which they do not waive, but have enforced, and propose to use as a defense against all comers. This is prior to their lien for the same debt on the Ohio and Indiana Divisions we are now considering. If the Indiana Division should sell for enough to pay the mortgage debt, then they could have no subsequent interest in how Compton should enforce his lien. If it should not, and there should be a deficiency, then there would be nothing left out of which to enforce their junior lien for the deficiency, except the Ohio Division. How can they, then, object to Compton's resort to the Ohio Division to enforce his lien, when that is all they propose to leave him by foreclosing their prior mortgage on the Indiana Division? Surely, they cannot prevent Compton from pursuing the only part left of the common security which they themselves divide by appropriation of the other part under a prior mortgage.

For these reasons, I think the suggestion that the Indiana mortgagees, or their alleged assignee, the purchaser, may object to this redemption without including the Indiana mortgages, has no weight. In my opinion, the decree of the court below should be modified so as to secure to Compton the right to redeem the Ohio Division alone from the purchaser of the Wabash Railroad Company by paying to it the amount due on the two Ohio divisional mortgages.

Finally, it is insisted that it is in conflict with public policy to permit a redemption of part of a consolidated and continuous line of railway. The decree of the court below permitted such a redemption for the consolidated railway extended from Toledo to St. Louis, and redemption was decreed of the road from Toledo to the Illinois state line. But it is said that this was because there was a separate lien on the road from Toledo to the Illinois line. That is true, and the same thing is true here. The divisional mortgages divide the line, by reason of their terms, and every succeeding company which embraced the Ohio Division in its line took subject to those mortgages. The only company which had any interest in the continuity of the line upon which an objection to a redemption of part could be based was the Wabash, St. Louis & Pacific Railway Company, and it is prevented from urging such an objection by the Ohio decree. Clearly, the divisional mortgagees, whose rights depend on the very division of which complaint is made, and who are to be paid in full, have no interest to preserve the continuity of the line. The decree of sale below provided for a separate sale of the Ohio Division, and had Compton been assured of the validity of his lien, as it was subsequently declared, and the decree had contained no saving clause, he could certainly have bid in the Ohio Division alone, by offering a sum exceeding the amount of the Ohio divisional mortgages. Why, then, can he now be prevented from doing what is substantially the equivalent of such a purchase?

It remains to inquire how the amount to be paid in redemption of the two divisional mortgages shall be estimated. Of course, the

mortgagees are entitled to the principal of their mortgages, with interest to the time of tender; but the more doubtful question is whether the amount thus to be calculated must be reduced by the net earnings of the mortgaged property, i. e. the Ohio Division, since the receivers turned over possession of the road to the purchaser. Compton secures his right to redemption through the original mortgagors. Whatever·they would have had to pay to redeem the mortgages, he must pay,—no more, no less. It is the general rule that a mortgagee in possession, when his mortgage is redeemed, must account for the rents and profits during his tenancy. Russell v. Southard, 12 How. 139, 155. The Wabash Railroad Company, as the successor in title of the purchasers at the sale, is to be regarded as the first Ohio mortgagee in possession, and therefore liable to account for the rents and profits or net earnings of the mortgaged property, in ascertaining the amount required to redeem the principal and interest of the mortgages. Our view of the saving clause in the decree for sale makes Compton's attitude with respect to the foreclosure sale quite like that of a junior incumbrancer with respect to a sale in a foreclosure proceeding brought by a senior mortgagee, to which the former was not a party. In such a case the weight of authority is that the purchaser is, with reference to the junior incumbrancer, the assignee of a mortgage in possession, and therefore liable to account for the rents and profits. Jones, Mortg. (5th Ed.) § 1395; 2 Hil. Mortg. 158; Vanderkemp v. Skelton, 11 Paige, 28; Walsh v. Insurance Co., 13 Abb. Prac. 33; Van Duyne v. Shann, 39 N. J. Eq. 6; Bunce v. West, 62 Iowa, 80, 17 N. W. 179; Spurgin v. Adamson, 62 Iowa, 661, 18 N. W. 293; Ten Eyck v. Casad, 15 Iowa, 524; Murdock v. Ford, 17 Ind. 52. In two cases a different view has been taken. Catterlin v. Armstrong, 79 Ind. 514; Renard v. Brown, 7 Neb. 449; 2 Jones, Mortg. (5th Ed.) § 1118a. The theory upon which the last-mentioned cases go is that, by the defective sale, not only the mortgage passed to the purchaser by assignment, but also the equity of redemption, and the purchaser must be presumed to be holding the property as owner of the equity, rather than as mortgagee, and therefore not to be accountable for the rents and profits. If the purchaser becomes the possessor of the property by the payment of anything substantial over and above the foreclosed mortgage debt, the argument is a strong one that the rents and profits should be used to recompense him for such an outlay in securing the possession of the property. Gray v. Nelson, 77 Iowa, 63, 41 N. W. 566. But where, as in the case at bar, the purchase price is equal only to the amount due on the first two mortgages, it would not seem consistent with equity to permit such a purchaser to maintain, against a junior incumbrancer seeking to redeem, that he is receiving the rents and profits as the owner of the equity, rather than as the owner of the mortgages which are galvanized into life to meet and defeat the otherwise good claim of the junior incumbrancer to a first lien. When the sale in this case took place, the mortgaged property was in the hands of receivers,—that is, the mortgagees were in possession,— and the rents and profits were applicable to the mortgages in the order of their priority. Howell v. Ripley, 10 Paige, 43; Miltenberger

v. Railway Co., 106 U. S. 286, 1 Sup. Ct. 140. If, as to Compton, the sale merely operated as an assignment of the various interests of the parties, the purchaser, as the assignee of the prior mortgages in possession, would seem to have derived his possession, and to maintain it, through the mortgagees, rather than from the owner of the equity of redemption. For these reasons, I think that Compton is entitled to an account of the net earnings of the Ohio Division of the Wabash Railroad Company over and above all operating expenses, including reasonable and necessary repairs, and that this sum should be deducted from the principal and interest due on the two mortgages. Of course, the railroad company is entitled to credit for all taxes paid by it, and for the cash advanced by it, in lieu of the bonds under the first mortgages, to pay receiver's obligations and other expenses properly chargeable as liens against the corpus of the road prior in right to the mortgages.

The last point to be noticed in this long discussion of a troublesome and complicated case is that presented by the motion to dismiss on the ground that the same decree as that appealed from was entered in Indiana, and was not appealed from. This is said to estop appellant from proceeding here. The question in the Indiana case was what remedy Compton could have for the enforcement of his lien against the Indiana property, not the lien against the Ohio property. The prayer in the Indiana court was confined to Indiana property as the prayer in the Ohio court was confined to Ohio property. Obviously, the question whether, under that decree, Compton could appropriate the Ohio Division to pay his lien was very different from the point which he made in the Indiana suit, namely, that by virtue of the decree, and otherwise, he could appropriate the Indiana Division alone to the payment of his lien. The validity of Compton's lien was upheld in each court. The question was as to the remedy. Certainly, a decree of an Ohio court which directed the sale of Ohio property to satisfy a lien would not be conclusive, in an Indiana court, of the right of the same plaintiff, under Indiana law, to appropriate Indiana property to the satisfaction of the same lien. It follows that as the points decided in the two cases were not the same, and as the subject-matter was not the same, the decree in the one court does not work an estoppel in the other to prevent an appeal.

Judge LURTON and I differ upon the following questions, which will be certified to the supreme court on the statement of facts set forth at the beginning of this opinion: First. Had Compton the right, under the saving clause of the decree for sale, to a decree for the redemption of the Ohio Division only? Second. In fixing the amount to be paid in redemption, is he entitled to have the principal and interest of the mortgages to be redeemed reduced by the net earnings received by the purchaser? Third. Is the decree of the circuit court of the United States for the district of Indiana between the same parties. and unappealed from, res judicata upon the foregoing questions in this court? It is ordered that all proceedings of the cause be stayed until the instructions of the supreme court upon these questions shall be received by this court.

LURTON, Circuit Judge. The contention of Compton that the paragraph reserving his rights should be construed so as to entitle him to an absolute decree against the purchaser for the amount due him under his Ohio decree, when it was determined that he had a lien, and regardless of its rank, is not founded in reason or justice. Such a construction would operate to prefer his claim over all others, without regard to the place and rank of the other lienors. What the court meant to do was to leave Compton's claim undetermined by the decree of foreclosure, and to reserve power and jurisdiction over the purchaser to enforce his lien by appropriate remedy, under all the facts, if it should be found that he had one. This view is made manifest by the concluding sentence of the paragraph, which says, "It being the intention to hereby preserve the rights of said Compton in the relation in which he now stands towards the mortgagees, parties hereto."

To attribute to this decree a determination that Compton's lien, if he had one, should override all others, and entitle him to an absolute decree against the purchaser, would not be a preservation of the relation in which he stood to other lienors, some of whom were asserting priority over Compton, but to destroy that relation, and settle the rank of his lien, without a hearing upon that question. Such a clause should be interpreted in the light of the whole record preceding it, and of the other portions of the decree of which it was a part, and of the issues which might arise upon Compton's claim, for he had not then answered. Read in this light, the court adjudged nothing affecting Compton. The fact of a lien, and the rank thereof, was left undetermined. I was at first strongly inclined to the opinion that the effect of the whole decree was to sell the entire railroad, free from all liens, including Compton's, and that his lien, like all others, was transferred to the proceeds of sale. Inasmuch as the foreclosure decree provided for the payment of the purchase money chiefly in bonds and coupons secured under the several mortgages foreclosed, it was essential to the preservation of Compton's rights in the fund that there should be reserved a right to require the purchaser to pay off Compton's lien, if the rank of his lien was found to be such as to entitle him to payment out of the fund, and in advance of securities which had been paid in by the purchaser. I still think there is much room for this interpretation of the decree, in view of its language, and of the strenuous effort made by all the prior and subsequent mortgagees to offer the property free from all liens and incumbrances. This construction would operate to defeat any recovery by Compton, inasmuch as the two divisions covered by his lien did not sell for a sum sufficient to pay off the prior liens. I have come, however, to an appreciation of the injustice which this construction would do him. He was placed at some disadvantage by a sale in advance of the determination of his rank, the place of all others being fixed and known. This consideration, in the light of other parts of the decree lending support to the idea of a sale subject to any lien which Compton might successfully maintain, persuades me to adopt the view taken by the circuit court,—that his lien was not foreclosed,

and that the property was sold free from all lien, charge, or incumbrance, save that of Compton. His attitude is therefore precisely what it would have been, with respect to remedy, if he had not been a party to the foreclosure proceeding. Instead of dismissing the bill, as to him, without prejudice, the circuit court sold subject to his lien, and reserved jurisdiction to thereafter adjudge to him such relief, by sale or otherwise, as should be appropriate. What would be the proper remedy could not be foreseen, and nothing in the saving clause deals with the question of remedy, beyond a reservation of jurisdiction over the purchaser to enforce such remedy as, under established principles of equity, should be appropriate. It was not improbable that the biddings on the divisions embraced within Compton's lien would be sufficient to pay off the prior incumbrances, and Compton as well. If this had been so, it is clear that the remedy would have been neither sale nor redemption, but a payment out of proceeds of sale. This, unfortunately, proved not to be the case. The sale accepted was under a bid for the entire line. The unit bid aggregated but an insignificant sum over the aggregate of the separate bids on divisions. The bid on the Ohio Division was for barely enough to pay off the two Ohio divisional mortgages, while the bid on the Indiana Division was insufficient to pay off the second Indiana divisional mortgage, by more than a million of dollars. I quite agree with Judge TAFT in holding that under these circumstances the character of the remedy to which Compton was entitled must be determined "wholly apart from anything in the decree for sale, because the saving clause leaves it entirely in the judgment of the court." I also agree with him in the conclusion that, under existing circumstances, Compton is not entitled, either by force of the Ohio decree, or under the general principles of equitable practice, to a decree for a resale, and that the only relief which a court of equity should afford him is that of redemption. Compton must stand as an unforeclosed lienor, obliged, by change of circumstances, to apply to equity for relief upon the footing of a decree which is nonenforceable according to its terms. Though nominally a defendant, he is really and substantially a complainant. It would be clearly inequitable to grant a decree for a resale of the Ohio property, in view of the existing status. Such a decree now would be by no means the decree he obtained. If he had executed that decree before any obstacle arose, and obtained possession as a purchaser, he would have been obliged to have redeemed the senior mortgages. The remedy of a junior incumbrancer, both before and after foreclosure, is to redeem the senior mortgage. Without the consent of the prior mortgagee, a junior lienor could not enforce a sale of more than the mortgagor's equity of redemption. If he wished a sale free from the prior lien, and the prior lienor will not consent, the decree should be that he redeem, and then foreclose for the enforcement of his own lien, and that he had redeemed. 2 Jones, Mortg. §§ 1394–1396, 1431, 1439, 1580; Jerome v. McCarter, 94 U. S. 734; Woodworth v. Blair, 112 U. S. 8, 5 Sup. Ct. 6; McKernan v. Neff, 43 Ind. 503; Spurgin v. Adamson, 62 Iowa, 661, 18 N. W. 293. A judicial foreclosure sale is not void because one interested

in the equity of redemption, as a junior mortgagee, was not a party. "The sale vests the estate in the purchaser, subject to redemption by the owner of the equity, or other person interested in it, who was not a party to the proceedings. His only remedy, however, is to redeem." Jones, Mortg. § 1395. Martin v. Noble, 29 Ind. 216; Frische v. Kramer, 16 Ohio, 125; Rose v. Page, 2 Sim. 471; Fulghum v. Cotton, 3 Tenn. Ch. 299; Trayser v. Trustees, 39 Ind. 556; Bank v. Goldman, 75 N. Y. 127. I agree with him in the conclusion that Compton's only remedy is through redemption, not only for the reasons so forcibly stated by him, but upon other considerations which will hereafter be stated in connection with the question of entire or partial redemption. I am not at all in agreement with him as to the duty of the court to allow a separate redemption of the Ohio divisional mortgages.

1. If we are right in the agreement that the decree reserving Compton's lien from foreclosure, and his rights for future determination, leaves all questions concerning the validity, extent, and character of his lien, and all questions touching the remedy for the enforcement of his lien, as completely open as if he had never been a party to the foreclosure proceedings, then it must follow that his attitude now is that of a complainant. Neither should the court be moved to enlarge the remedy to which he would otherwise be limited by reason of the fact that he was made a defendant in the foreclosure suits, and that he came in unwillingly. He was not enjoined from enforcing a sale under his state decree, and might have proceeded with his sale, although made a defendant to the general foreclosure proceedings. Why did he elect to abandon the remedy the Ohio court had awarded him? The answer is obvious. So many obstacles had arisen, both pending his suit and after his decree, that his remedy by sale had become practically unavailable. Pending his suit the United States courts had taken possession of the entire line of railroad, of which the Ohio Division was but a part, first under the general insolvency bill filed by the Wabash, St. Louis & Pacific Company v. Central Trust Company and others, and finally under an extension of that receivership to the foreclosure suits out of which this controversy arose.

The pendency of his suit was no obstacle to the institution of these subsequent foreclosure proceedings, and none to the seizure of the property by the courts in which they were begun. If he had not been made a party to these subsequent foreclosure suits, and had proceeded with his sale under his decree, the purchaser would have been obliged to have intervened in order to have obtained possession, or to have waited until the receivers were discharged, and then, by an independent suit with the purchaser under the federal foreclosure decree, had his right and title determined. In either case, as the owner of a mere equity of redemption obtained under a foreclosure decree, to which senior mortgagees were not parties, he could have obtained no relief except through redemption of the prior liens. No injury was done him by making him a party to the subsequent suits, in which it was sought to sell the property free from all liens, and to marshal the assets according to priorities.

Indeed, he was a proper party to a simple foreclosure of the mortgages senior to his own lien, and a necessary party to any decree intended to convey to the purchaser a clear title. In such a suit his natural attitude would be that of an active, rather than a passive, party. Such, in fact, was the position which he at once assumed when he found that he could not escape the jurisdiction, for he availed himself of the decree which required that all answers theretofore or thereafter filed which stated matter that was proper foundation for affirmative relief should be deemed and taken as cross bills. By his answer he sought: First, the enforcement of his Ohio decree by a sale of the Ohio Division separately from all other parts of the road; second, to reach, and subject to his lien, certain terminal properties at Toledo, Ohio, of great value, which he claimed had been acquired after the Ohio divisional mortgages, and had not passed to the Ohio mortgagees; third, he claimed priority over the divisional mortgagees in all of the rolling stock and equipments acquired after the prior mortgages; fourth, he demanded an accounting as to the earnings of the Ohio Division, claiming that they were greatly in excess of its share of operating expenses, and that the surplus had been improperly applied to the support and improvement of other divisions of the consolidated line. From the filing of that pleading down to the final decree from which he has appealed, he was in the attitude of one seeking relief by a sale, or by redemption, if that was inadmissible. After the foreclosure decree his status was more than ever that of one applying to a court of equity for relief upon the footing of a former decree, which, by circumstances subsequently ensuing, could not be advantageously enforced without further aid. That the court did not foreclose his lien, along with those of the other lienors, was a matter of pure grace and indulgence to him. That the rank of his lien was undetermined was no obstacle to a foreclosure sale by which all liens would have been transferred to the proceeds of sale. Bank v. Shedd, 121 U. S. 74, 7 Sup. Ct. 807. Yet that indulgence is now made ground for complaint, and demand is made for a resale, or for granting him a separate redemption of the Ohio mortgages, even though otherwise unentitled. I see no merit in this claim for indulgence whatever.

2. In the determination of the question as to whether Compton may redeem the Ohio Division without also redeeming the Indiana mortgages, the remedy awarded him by the Ohio court should have no conclusive effect whatever. In permitting him to sell so much of the road as was within the state of Ohio, subject to the senior liens thereon, the court did not adjudge him to have a separable lien on the Ohio Division, and another on the Indiana property. It merely awarded him a sale as at law, under execution. Because the court limited the sale awarded to the property within its jurisdiction, it is not to be inferred that it thereby adjudged that Compton had one lien embracing two separable equities of redemption. No question as to whether, under his lien, he could redeem separately, was submitted, involved, or decided. The remedy awarded appears to me to pertain to process, and not to be within the principle of res

adjudicata, even as to the parties to his suit. Clearly, no estoppel exists, in consequence of the grant of that remedy, applicable either to the two original mortgagor companies, or any of their mortgagees, inasmuch as they were not parties to his case. If any legal or equitable reason existed before that decree which would enable them, or either of them, to require redemption of all the mortgages senior to his lien, or none, that right remained unaffected by a decree to which they were not parties. The Ohio court, in its statement of the case, described the suit, and the issues presented and the relief sought, by saying: ·

"This was an action commenced in the court of common pleas of Lucas county by James Compton, asking that certain bonds, of which he claimed to be the owner, with the unpaid interest coupons thereon, should be declared a lien upon so much of the road of the Wabash, St. Louis & Pacific Railway Company as formerly belonged to the Toledo & Wabash Railway Company, by whom the bonds had been issued, and for the finding of the amount due him thereon, and an order of sale of so much of its road as is within the jurisdiction of the court, subject to certain admitted prior liens, unless the amount found due him should be paid by the Wabash, St. Louis & Pacific Company in a short time, to be named, and for other relief." Compton v. Railroad Co., 45 Ohio St. 592, 16 N. E. 110, and 18 N. E. 380.

The only other reference to a remedy in the course of a very lengthy opinion is found near its conclusion, the court simply saying:

"The plaintiff is entitled to a finding of the amount due on the bonds held by him, and an order for the sale of so much of the road as is within the jurisdiction of the court."

I am utterly unable to agree that the limitation upon the order of sale to so much of the road as was within the state is an adjudication conclusive upon all the parties to that suit "that he has a lien which may be enforced against the Ohio Division alone, without regard to his remedy against the Indiana Division," "and that he may redeem it by paying to the purchaser, the Wabash, St. Louis & Pacific Railway Company, the amount due on the Ohio divisional mortgages." This conclusion that, because he was permitted to sell the Ohio Division separately, therefore he may redeem it separately, seems to me utterly unsupported by the premises; yet Judge TAFT seems to rest it upon the assumption "that, against all the parties to his Ohio suit, he may exercise this right, because it was incident to the relief granted in the Ohio decree."

3. But, if it be assumed that a right to separately sell the Ohio Division is within the estoppel of that decree, as to the parties, it is not incumbent on a court of equity, when a complainant applies to it for relief upon an ineffective decree, which cannot be enforced without further equitable aid, to extend him any assistance, unless he will do equity. In the determination of what relief he is entitled to, the court cannot escape a consideration of his rights with reference to the mortgages senior to his lien, as well as his rights in relation to the other titles, rights, and equities united in the purchaser from whom redemption is sought. If his decree is ineffective, for want of means to execute it; if the remedy awarded him by his decree is insufficient, and incapable of practical enforcement, —then the court will look into his decree, even as to its merits, and

refuse to enforce it, except in so far as it may deem just and equitable. The doctrine on this subject may be thus stated: When a decree is incomplete, or becomes ineffective for the want of means by which it may be executed, and application is made to a court of equity to render the decree effective, the doctrine of res adjudicata will not operate to prevent the court from looking into the nature and character of the decree for the purpose of determining whether it would be just and equitable that the complainant should be assisted, and his defective decree pieced out. If the decree be found unjust and inequitable, the court, under such circumstances, will not be moved to action, but leave the party to his remedy at law, or extend aid on condition that he do equity. 2 Daniell, Ch. Prac. (4th Ed.) 1586; Adams, Eq. 416; Gay v. Parpart, 106 U. S. 699, 1 Sup. Ct. 456; Lawrence Manuf'g Co. v. Janesville Cotton Mills, 138 U. S. 552, 11 Sup. Ct. 402. This doctrine, in its last analysis, rests upon the settled principle that he who seeks equity must do equity. Manifestly, this principle must apply to a case like the one in hand, when the question is purely one of remedy. This court ought not to grant any relief, except such as in equity and justice is appropriate, under all the circumstances. This doctrine would apply if the defendant, resisting partial redemption, united in itself only the rights of the mortgagor corporation and the mortgagees who were parties to the Ohio decree. If this doctrine goes so far as that the court may look into the merits of the decree which it is asked to piece out, a fortiori it is applicable when such a complainant demands a particular remedy because it is supposed to be an "incident" of the remedy which has become impracticable, or because it is supposed to be most analagous. Before a court of equity will be moved to lend its aid to an ineffective decree, it will inquire into all the circumstances calculated to enlighten the conscience of the court, and grant its aid only upon such terms and conditions as are just.

4. Among the matters which the court should take cognizance of when Compton asks to be allowed a separate redemption of the Ohio property, is an inquiry as to his right to redeem at all, for want of proper parties. The lien which he asserts is not one for his exclusive benefit. All of the unpaid creditors of the Toledo & Wabash Railway Company are equally entitled to share in the security which he is undertaking to appropriate to the satisfaction of his own claims. The Ohio decree made no disposition of the proceeds to arise from the sale awarded him, but directed that the proceeds should be paid into court, and held subject to further orders to be made on the footing of the decree. The decree itself only declared the lien. The lien is the creature of statute, and arose upon the consummation of the consolidation of 1865, by force of the statute, and his decree adds nothing to its efficiency, aside from the finding that he was a creditor. Compton's Ohio suit ought to have been a suit for the equal benefit of all entitled to share in the benefits of the lien asserted. It was not. His present suit should have been a suit for the benefit of the whole class, and so brought as to quiet the title of the present owner of the property. It is not. His decree amounts to nothing more than a declaration of a valid and

unsatisfied lien, superior in rank to all mortgages subsequent to the consolidation of 1865, and inferior to all antecedent to that date. That the defendants to the suit in which the statute was construed and the lien declared did not demur because his suit was not a class suit is no answer to the objection now interposed, when he asks for a different remedy in aid of an otherwise ineffective decree. But if the Toledo & Wabash Railway Company be regarded as cut off from interposing such an objection, in so far as it is the assignee and representative of the mortgagors and mortgagees who were parties to his Ohio suit, yet, in so far as it is the assignee of the mortgagees who were not parties, it is not estopped. The objection lies at the very foundation of his right to a partial redemption, because it will leave the defendant corporation holding the remainder of the estate embraced within the lien subject to future redemption by the appellant, or any other creditor interested in the class lien. But, more than this, the appellee, as the equitable assignee of mortgages junior to the Compton lien, has the unquestioned right to redeem from the creditors entitled to the benefit of the lien. They are, perhaps, hundreds in number, and the aggregate of their claims is wholly unknown. If it redeem from Compton by paying off his debt, it will continue subject to a like liability for an unknown amount, and to an unknown number of people. It may be said that this is an objection which applies to any redemption at all by him. This may be admitted, for, undoubtedly, Compton should have so brought his case as to bring all interested in the lien before the court, that the purchaser under junior liens might have the option of redeeming this lien and quieting its title, or submitting to redemption, and surrendering its title to the property covered by this lien. Not having done this, he ought not to be allowed to further aggravate the situation by compelling the appellee to submit to partial redemption.

5. There are other objections which are peculiarly applicable when a complainant seeks relief through equitable redemption. The senior mortgages upon the Indiana and Ohio Divisions operated to vest in the mortgagees the legal title, subject to divestiture upon payment of the debts secured within the time limited by the contract. The failure to pay on the pay day made the title at law absolute. There was no statutory right of redemption, and no redemption or buying back was admissible, except through application to a court of equity. Chancery courts, to relieve against the forfeiture which at law was absolute, have created an equitable right of redemption, which it allows upon equitable principles, and subject to the equitable maxim that "he who seeks equity must do equity." Of course, a court of chancery does not, through this maxim, obtain authority to impose arbitrary conditions, not warranted by settled principles of equity jurisprudence. The boundaries within which it may be applied are well defined by Mr. Pomeroy, who says:

"The meaning is that whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its inter-

position and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of, or necessarily involved in, the subject-matter of the controversy. It says, in effect, that the court will give the plaintiff the relief to which he is entitled only upon condition that he has given, or consents to give, the defendant such corresponding rights as he also may be entitled to in respect of the subject-matter of the suit." Pom. Eq. Jur. § 385.

The first objection which has been urged to a partial redemption grows out of the relation of principal and surety which exists between the Toledo, Wabash & Western Railway Company and the Toledo & Wabash Railway Company. In November, 1858, the Ohio and Indiana mortgagor companies consolidated their properties, and were merged into a new consolidated company, entitled the Toledo & Wabash Railway Company, which new company subsequently issued the bonds called "Equipment Bonds," of which Compton holds 150. The result of this consolidation is very tersely stated by Mr. Justice Gray, when considering the effect of this very consolidation, who said the result was a new corporation, "which took their places, succeeded to their property, and assumed their liabilities." Railway Co. v. Ham, 114 U. S. 595, 5 Sup. Ct. 1081; Shields v. Ohio, 95 U. S. 319; Compton v. Railroad Co., 45 Ohio St. 623, 16 N. E. 110, and 18 N. E. 380.

The Ohio consolidation statute, under which the successive consolidations occurred, was passed April 10, 1856, and expressly provided that:

"All debts, liabilities and duties of either of said companies shall henceforth attach to said new corporation and be enforced against it to the same extent as if said debts, liabilities and duties had been contracted by it."

The Indiana act of February 23, 1853, authorized the consolidation of railroad companies which might connect at the state line with a road of another state constructed to the state line, "upon such terms as may be by them mutually agreed upon in accordance with the laws of the adjoining state with whose road or roads connections are thus formed." 1 Gavin & H. St. 526. The consolidation agreement, among other things, provided:

"That the said consolidated company shall assume, and be liable for, all outstanding bonds, indebtedness, and other liabilities of each of the parties to this agreement; and all mortgages given by either of the parties shall be as valid and binding upon the whole of the road, real estate, fixtures, and personal property which may be described in such mortgage as though the same had been originally executed by such consolidated corporation."

The undoubted and undisputed effect of this consolidation was that the Toledo, Wabash & Western Railway Company became obligated to pay off and discharge each one of the four mortgage debts which existed at the date of this consolidation, in 1858. Its liability was not merely that of one buying property subject to an existing incumbrance, for it personally assumed, and by the statute became personally liable for, the entire indebtedness of its constituent companies. This much is expressly decided by the Ham Case and the Compton Case, heretofore cited. Precisely the same liability was imposed upon each of the successor consolidated com-

panies, who by subsequent consolidations succeeded to the property of the original mortgagor companies. This is very clearly recognized in the opinion of Judge TAFT, when he says, in his statement of the case, that "many of the constituent companies had issued bonds secured by mortgages upon their respective lines, and as consolidations took place the new companies assumed the obligations of the bonded and other debts of their constituents."

The successive assumptions of these prior mortgage debts did not operate to release or discharge the liability of the original mortgage debtors, or that of any obligor by assumption precedent to the last consolidation. The original mortgage debtors, and each succeeding obligor, were liable to the creditors as joint and several principals, and for deficiency in value of mortgaged property the creditors might have judgment against any or all who were thus liable as principals. The Ohio statute authorizing consolidations for the purpose of preserving the rights of creditors, provided that "the respective corporations may be deemed to be in existence to preserve the same." "A purchaser who assumes the mortgage becomes, as to the mortgagor, the principal debtor, and the mortgagor a surety; but the mortgagee, unless he has assented to such an arrangement, may treat both as principal debtors, and may have a personal decree against both. The mere assignment by the mortgagor of his interest in the mortgaged premises to a third person, who agrees to pay off the mortgaged debt, does not release the mortgagor. There is no novation, unless there is something to show that the mortgagee has released the mortgagor, and has agreed to look solely to the purchaser for payment of the mortgage debt." Jones, Mortg. § 741; Shepherd v. May, 115 U. S. 510, 6 Sup. Ct. 119; Burr v. Beers, 24 N. Y. 178; Ellis v. Johnson, 96 Ind. 377; Insurance Co. v. Hanford, 27 Fed. 588. As between the mortgagor and his successor in the title, who assumes the payment of the debts charged thereon by prior lien and the mortgagee, the land is the primary fund for the payment of the debt. Wells v. Tucker, 57 Vt. 223; Jones, Mortg. §§ 678a, 740–743; Bank v. Thayer, 136 Mass. 459. Thus, the property which the Toledo, Wabash & Western Railway Company acquired by consolidation of the constituent companies was, as between those companies and their mortgage creditors, the primary fund for the discharge of the mortgage debts. If mortgage creditors release this property without the consent of the original debtor companies, it thereby discharges them, to the extent of the value of the security thus abandoned. Paine v. Jones, 14 Hun, 577; Remsen v. Beekman, 25 N. Y. 552; Bowne v. Lynde, 91 N. Y. 92.

This right of the surety companies to have the property which became a primary fund applied in exoneration of their relations as sureties for the new consolidated company is not a right which can be affected or waived by any successor company which occupied the relation of principal towards such surety. The surety entitled to such exoneration might waive it, and so could the creditor; but, as we have seen, a creditor would thereby release the obligation of the surety, to the extent of the value of the property released. This principle has no application, as a consequence of the original con-

solidation by which the Toledo & Wabash Railway Company was formed in 1858. Its constituent companies were not sureties for each other, and the promise of the consolidated company was a separate promise to each of its constituents. The obligation of the Toledo & Wabash Railway Company, so far as it rested upon the consolidation agreement, to pay the debts of its Indiana constituent, was to that constituent alone; and the Ohio constituent could not object to a separate sale of the Ohio Division, or its separate redemption, for no obligation to it would be violated. But quite a new state of affairs arose so soon as the second consolidation occurred, in 1865. The consideration for the consolidation which moved to the Toledo & Wabash Railway Company was that, in consideration of all its property, the new consolidated company, the Toledo, Wabash & Western Railway Company, would pay all its obligations and liabilities, of every kind and character. This, of course, included its obligations to pay off the two Indiana divisional mortgages and the two Ohio divisional mortgages, all four of which had been assumed as a condition of the consolidation in 1858. Upon the consummation of this act of consolidation, there arose the relation of principal and surety between the Toledo, Wabash & Western Railway Company and the Toledo & Wabash Railway Company, which relation resulted in an obligation of the former company to apply all of the property of the latter company in discharge of its debts, and in exoneration of its liabilities. The consolidation agreement by which the Toledo, Wabash & Western Railway Company was formed, in 1865, set out the indebtedness of the Toledo & Wabash Railway Company, and made no distinction between the mortgages on its Indiana and Ohio Divisions. Its bonded debts were described as:

First mortgage bonds...........................................$3,400,000
Second    "       "      ......................................... 2,500,000
Equipment bonds............................................... 600,000

It provided that all its rights, franchises, property, debts, and choses in action should vest in the consolidated company, and that the consolidated company should "protect" all of its indebtedness as it should fall due. Thus, the Toledo, Wabash & Western Railway Company assumed the relation of principal obligor, as to all the debts and obligations of its constituents, the Toledo & Wabash Railway Company. The latter company continued bound to the creditor, but, as between it and the Toledo, Wabash & Western, it was a mere surety. Out of this relation originates the right of the Toledo & Wabash Railway Company to object to partial redemption,—a redemption by which the Ohio Division, which is worth more than the mortgage debts secured specifically thereon, may be redeemed separately, leaving the Indiana mortgage debts unpaid and inadequately secured, to the extent of $1,300,000, as demonstrated by the bids on that division under the foreclosure decree. Such a redemption would leave the Toledo & Wabash Railway Company liable on the Indiana bonds to the extent of this deficiency. It would have the right to insist that the whole of its property conveyed to the Toledo, Wabash & Western Railway Company shall be applied in its exoneration;

and if that corporation was to-day seeking to redeem that part of the property which was of greater value than the mortgage debts specifically secured thereon, without also redeeming the Indiana mortgage debts which were inadequately secured, its objection in a court of equity would be potential, and the Toledo, Wabash & Western Railway Company would be required to redeem all, or none, on the principle that it must do equity, as a condition of equitable redemption.

It may be urged that this right of the Toledo & Wabash Railway Company to object to separate redemption upon the ground of its surety relation to the Toledo, Wabash & Western Railway Company is one which can only be made by it, and that it has never been a party to any of these foreclosure suits. Compton did not bring that corporation before the court in his Ohio suit, and he has not chosen to make it defendant to his present effort to obtain separate redemption. It was not a necessary party to either suit, in so far as the establishing of his debt and lien were concerned. He might bring his suit against the corporation which had succeeded to the title and ownership of the property, and which had assumed a primary obligation for his debt. But he cannot escape the effect of any defense to a separate redemption which any of the predecessors in the title might make, by omitting to bring such predecessors before the court. When he asks for partial redemption, and the court can see that that relief would be inequitable and unjust to one of the obligors of his debt, in its relation as surety to other parties jointly liable as to him, it will either refuse to proceed with the suit until he brings the absent corporation before the court, or grant him only such relief as is consistent with the equities and rights of all affected by the remedy he asks. But it seems to me, on careful consideration, that the purchaser at foreclosure sale unites in itself the legal title and the equities, rights, and defenses which pertained to each of its predecessors in title, and may interpose any defense to the demand for separate redemption which any one of its predecessors could make if they were called upon to submit to such redemption. If this is not so, then the absent predecessor corporations to be affected by the special relief sought are necessary parties to any proceeding which seeks such relief. If I am right in the proposition that the Toledo, Wabash & Western Railway Company could not redeem the Ohio Division separately, by reason of the surety relation of which I have spoken, then, for the same reason, Compton cannot. His lien arose as the result of the consolidation of 1865. The lien did not attach as a lien on property of the Toledo & Wabash Railway Company, but as a lien on so much of the property of the Toledo, Wabash & Western Railway Company as had been acquired from the Toledo & Wabash Railway Company. The language of the consolidation statute, which imposed a liability on the consolidated company for the debts of the constituent companies, was that:

"All debts, liabilities and duties of said companies shall henceforth attach to said new corporation and be enforced against it to the same extent as if said debts, liabilities and duties had been contracted by it." Act April 10, 1856, § 5.

This was the language which the supreme court of Ohio, in Compton's Case, construed as attaching an equitable lien upon the property of the Toledo, Wabash & Western Railway Company which it had received from the Toledo & Wabash Railway Company. The decree upon which Compton predicates his suit recites:

"That, upon the consummation of such consolidation, said bonds issued as aforesaid by the Toledo & Wabash Railway Company * * * became an equitable lien upon all of the said railroad and real property * * * which were owned by said Toledo & Wabash Railway Company, at the time of said consolidation passed to and vested in the said Toledo, Wabash & Western Railway Company, and which afterwards passed to and vested in the defendant the Wabash, St. Louis & Pacific Railway Company."

The lien did not exist before the consolidation, but arose as a result of the act transferring the property. To say that a lien which originated only as a result of the passage of the title is a lien against the company whose act transferred it to another, would be as inexact as to say that a vendor's lien rests upon the property of the vendor, when in fact it originates as a result of the passage of the title, and must be a lien on the estate of the vendee in the property. The distinction is a nice one, but it is an obvious one, when we look closely into it. It is also an important fact, in its consequences, for if a lien imposed on the property of the Toledo & Wabash Railway Company, while owned by that company, would, as urged by Judge TAFT, be a lien upon the separable equities of redemption owned by that company, a lien imposed after the transfer of the title of the Toledo & Wabash Railway Company to the Toledo, Wabash & Western Railway Company, which took under a single engagement or promise to pay off the debts of the Toledo & Wabash Railway Company, would bring into operation the principle that such single promise required a single redemption. Compton's right of redemption cannot be other or different than that of the corporation upon whose property the lien rested, whether imposed by law, or arising out of contract. It must therefore follow that, if the Toledo, Wabash & Western Railway Company could not redeem part without redeeming all, Compton, with a lien which rests on its estate, can exercise no higher right of redemption. There seems to me to be still another principle applicable, where equitable redemption is sought, which reinforces what has already been said. That principle is that where several mortgage debts have become consolidated, so that the obligor in each is the same, and the mortgagee the same, though secured on distinct estates, there can be no separate redemption, against the will of the mortgagee. The principle that a creditor will not be deprived of a legal advantage by a court of equity, except upon equitable conditions, is of wide application. It was imbedded in the civil law; and a mortgagor was not permitted to redeem or buy back the legal title to realty, or the possession of a pledge, until he did equity, by paying, not only the debt secured by the mortgage or pledge, but any other debt subsequently created. Story, Eq. Jur. §§ 415, 1010, and note; Jarvis v. Rogers, 15 Mass. 389. There is some doubt as to whether a purchaser of the mortgaged land, or a subsequent incumbrancer, was affected by this equity between mortgagor and mortgagee. Judge

Story thinks that under the civil law the doctrine was limited to cases where no subsequent incumbrance was involved, while Chancellor Kent takes the contrary view. Story, Eq. Jur. § 1010, note; 4 Kent, Comm. Lect. 58, p. 136. Almost contemporaneously with the earliest announcement of the doctrine that equity would relieve against the forfeiture of the legal estate, and permit redemption after default, there was announced a condition upon which such equitable redemption would be accorded. That condition was that when there were two distinct mortgages upon distinct parts of the same mortgagor's estate, to secure distinct debts due to same mortgagee, the mortgagor would not be permitted to redeem one of his estates without at the same time redeeming the other, where it appeared that one of the debts was insufficiently secured. This was the simple rule as announced and applied in the early cases. Purefoy v. Purefoy, 1 Vern. 29; Shuttleworth v. Laycock, Id. 245; Margrave v. Le Hooke, 2 Vern. 207; Pope v. Onslow, Id. 286; Willie v. Lugg, 2 Eden, 78; Jones v. Smith, 2 Ves. Jr. 376. In Willie v. Lugg, cited above, the lord chancellor stated the rule, and the reason on which it stands, as follows:

"This bill is brought to redeem the East Dales, and to leave Dixon's farm, now reduced, in point of value, by the mortgagees selling a part for the benefit of the plaintiff, who had the inheritance. The question is whether she can come into this court for such an equity. Every mortgagee, when the mortgage is forfeited, has acquired an absolute legal estate. Upon what terms can this court proceed to a redemption? By giving the mortgagee the value of his money, its fruits, and his costs, and upon those terms only, for it is obvious injustice to help to the restitution of the pledge without a full restitution of what it is first pledged for. If a person makes two different mortgages of two different estates, the equity reserved is distinct in each, and the contracts are separate; yet, if the mortgagor would redeem one, he cannot, because, if you come for equity, you must do equity; and, the general estate being liable to both mortgagees, this court will not be an instrument to take illegally from a mortgagee that by which he will be defrauded of a part of his debt."

The editor of the second edition of Eden's Reports, in a note concerning the modern extension of the rule as stated in Willie v. Lugg, says:

"That a mortgagor of two distinct estates, upon distinct transactions, to the same mortgagee, cannot redeem one without redeeming the other, seems, by modern decisions, to have been extended to a purchaser of the equity of redemption of one of the mortgaged estates without notice of the other mortgage."

The cases of Watts v. Symes, 1 De Gex, M. & G. 240; Selby v. Pomfret, 1 Johns. & H. 336; Neve v. Pennell, 2 Hem. & M. 170, are applications of the rule of the old cases in suits for foreclosure, as well as redemption. Beevor v. Luck, L. R. 4 Eq. 537; Tassell v. Smith, 2 De Gex & J. 713; Vint v. Padget, Id. 611; Mills v. Jennings, 13 Ch. Div. 639; Cummins v. Fletcher, 14 Ch. Div. 699,—are all cases involving extensions of the old rule to subsequent purchasers or mortgagees, many of them involving the technical doctrine of tacking, as developed from the early cases of Brace v. Duchess of Marlborough, 2 P. Wms. 491, and Marsh v. Lee, 2 Vent. 337. That doctrine, in brief terms, was bottomed on the maxim of

noninterference between equal equities. Adams, Eq. 162. Through that maxim, if a third mortgagee advanced his money without notice of a second mortgage, he was permitted to buy in the first mortgage, thereby obtaining the legal estate, and then tack the third mortgage to the first, and require the second mortgagee to redeem both. This enabled the third mortgagee to squeeze out the intermediate incumbrancer by buying up a first mortgage, even when the second mortgagee's bill for foreclosure was pending. And this rule Lord Chief Justice Hale, with whom the rule, in a large measure, originated, called a "plank" gained by the third mortgagee, or tabula in naufragio. In Jones v. Smith, 2 Ves. Jr. 376, and Mills v. Jennings, cited above, the old rule, in its simple form, is stated, as well as the ground on which it stood. In Mills v. Jennings, Cotton, L. J. so well states the original doctrine, and the grounds upon which it has been extended, that I deem it best to make a liberal quotation:

"The rule as to consolidation of mortgages, in its simplest form, is this: That where one person has vested in himself, by way of mortgage, two estates, the property of the same mortgagor, one of these cannot be redeemed without the other; and this is so whether the two mortgages were originally granted to the same mortgagee, or, having been originally vested in different persons, have, by assignment, become vested in the same person. This was on the equitable principle that a court of equity would not assist a mortgagor in getting back one of his estates, unless he paid all that was due, though secured on a different estate. The mortgagor was coming into a court of equity to obtain its assistance in getting back an estate which at law belonged to the mortgagee, and it was held to be inequitable to allow him to get back an estate of more value than the debt charged on it, and to leave the mortgagee with an estate charged with a debt due by the mortgagor which might be of a larger amount than the value of the estate. But even the rule in this its simplest form was doubted by Lord Hardwicke in the year 1750, as appears by the report of Ex parte King (1), though he afterwards recognized and adopted it. Moreover, as a mortgagor cannot be allowed to prejudice the rights of his mortgagee by any dealings with the equity of redemption of the estate in mortgage, it has been held that a purchaser or mortgagee of one of two estates already in mortgage is, as regards the consolidation of the mortgages, in the same position as the original mortgagor; that is to say, the purchaser of an equity takes subject to all the equities affecting the person through whom he claims. * * * It is the circumstance of the mortgagor having created two mortgages on two different estates which gives the mortgagee of either estate, as soon as the second mortgage is created, a right to get both the mortgages into his hands; and to hold until the debt due on each is paid. The principle which allows, as against a subsequent purchaser or mortgagee, the right of consolidation, is that the mortgagor cannot, by any dealing with the equity of redemption, prejudice the rights of his mortgagee. This can only apply to rights already given, or arising from acts already done, by the mortgagor. The same principle will prevent the mortgagor from throwing a greater burden on the purchaser of his equity of redemption by any act done subsequent to the sale or mortgage of this estate. It is true that a mortgagee of one estate may get in and consolidate the mortgages on another estate against a purchaser of the equity of redemption of one of the estates, even though at the time of the purchase the two mortgages were vested in different persons, provided both the mortgages existed previously to the sale of the equity of redemption of one of the estates. But this equity arises out of acts done by the vendor of the equity of redemption previously to the sale; and the act after sale necessary to give effect to the right of consolidation—namely, the union of the mortgages on both estates in one person—is an act of persons who are no parties to the sale of the equity of redemption, and not bound to the purchaser by any contract

inconsistent with the claim to consolidate. In our opinion, the purchaser of an equity of redemption takes subject to such equities as arise from acts previously done by his vendor. He is subject to these equities, though acts of persons other than the vendor may be necessary to give rise to the equity." Mills v. Jennings, 13 Ch. Div. 639.

The doctrine established by the tacking cases proper—that a third mortgagee, without notice, may buy in a first mortgage, and thereby exclude a second mortgage—is not enforced in the courts of this country, in consequence of the effect of our registration system, which gives effect to conveyances in the order of registration. The policy underlying registration is that a mortgage shall not be a security for more than is expressed therein, as against subsequent purchasers or mortgagees. I quite agree with what was said by the Virginia supreme court, through Baldwin, J., in Siter v. Mc-Clanachan, 2 Grat. 304, that:

"The elements of the doctrine, it will be seen, are the possession by the preferred mortgagee of the legal title, and the pre-existence or accession of a distinct equity, without notice of mesne incumbrance. Hence it is obvious that it could never have been introduced into a country enjoying the benefits of a general registry, intended to give notice to the whole world of all conveyances and incumbrances, and to supply the place of actual notice. * * * In nearly all the states of this Union, the registry is held to be notice to subsequent purchasers and mortgagees, provided the deed has been duly proved or acknowledged. * * * It is easy to perceive that the operation of the registry laws of Virginia, and of other states of the Union, is to cut up by the roots the English doctrine of tacking, so far as it affects intermediate purchasers and incumbrancers."

It is equally clear that our registration system renders inoperative many of the principles upon which the rule now involved was extended so as to affect subsequent purchasers and incumbrancers. But registration laws manifestly have no effect upon the rule, as between mortgagor and mortgagee, or the application of the maxim upon which the doctrine rests, whenever a plaintiff resorts to equity to redeem or to recover the legal title to lands, or the possession of a pledge. If he seeks equity, he must do equity; and equity will not assist a debtor to deprive a creditor of a security which at law he may hold, until he has done equity, by discharging any just liability which exists between them. Great care must be observed in examining American cases touching this species of tacking, to see that they do not turn on the rule which makes the registration of a deed notice. Whenever they do so turn, they are not in point. Where the question arises between unregistered equities, or when the registry acts are, from any cause, inapplicable, there "seems to be nothing to prevent the holder of a third mortgage from obtaining priority over a second, of which he was ignorant at the time of taking his own, and which has not been placed on record, by buying in the first, or obtaining a conveyance of the legal title in any other way, although the question is of little practical importance, because it cannot arise unless both mortgages are unrecorded, when it will be easier to record the third than to resort to the expedient of purchasing the first." 1 White & T. Lead. Cas. Eq. 856. There are many American cases illustrative of the application of this equitable maxim to bills seeking to recover a legal title, or to re-

deem a mortgage, where the interests of third persons had not intervened. Baggarly v. Gaither, 2 Jones, Eq. 80; Carroll v. Johnston, Id. 120; Chase v. McDonald, 7 Har. & J. 196, 197; Coombs v. Jordan, 3 Bland, 284; Lee v. Stone, 5 Gill & J. 22; Downing v. Palmateer, 1 T. B. Mon. 70; Hughes v. Worley, 1 Bibb, 200; Colquhoun v. Atkinsons, 6 Munf. 550; Siter v. McClanachan, 2 Grat. 299; Walling v. Aiken, 1 McMul. Eq. 2; Chamberlain v. Thompson, 10 Conn. 251; Phelps v. Ellsworth, 3 Day, 397; Rowan v. Rifle Co., 29 Conn. 324; Scripture v. Johnson, 3 Conn. 211; Bank v. Rose, 1 Strob. Eq. 257; Anthony v. Anthony, 23 Ark. 479; Williams v. Love, 2 Head, 80; McGoldrick v. McGoldrick, 2 Coop. Ch. 543; Evans v. Land Co., 92 Tenn. 348, 21 S. W. 670. I am quite aware that some of the state courts have abandoned every vestige of the doctrine concerning even this species of tacking. In some this has been attributable to the abandonment of equity procedure altogether. In others, like New York and Michigan, where the courts hold that the mortgagor retains the legal title, the mortgagee being a mere lienor, there was, as a consequence, no necessity for equitable aid in recovering the legal title. In courts of the United States the holding, where, by the local law of the state, a different ruling has not been required, has consistently been in accord with the English common-law and equity cases as to the title of the mortgagor. When the jurisdiction of the United States courts is invoked by a mortgagor or a junior lienor, to allow equitable redemption, it seems to me that we are not warranted in according it without annexing those equitable conditions which have been announced by the courts whose decisions lie at the very foundation of our jurisdiction, and which accord with justice and conscience. So far as the American system of registration conflicts with these rules, they are no longer entitled to our allegiance; but, so far as that system of statutes has left play for the fundamental condition that "he who seeks equity must do equity," we should accord to the old cases full weight.

My conclusion is that the Toledo, Wabash & Western Railway Company, having assumed both sets of mortgage debts at the time it acquired the mortgaged estate, could not redeem one part of the estate without redeeming the other, the mortgagees being the same. Does Compton occupy any better position? Clearly not. He is not an incumbrancer by a single instrument on one of the mortgaged estates. Neither is he a purchaser for value of the mortgagor's interest in one or both. By force of the Ohio statute the debts due from his debtor became, under the Ohio construction of that statute, an equitable charge on all the property of the Toledo & Wabash Railway Company in the hands of the Toledo, Wabash & Western. This general unit lien is the one asserted now by Compton, as affording him a right, in equity, to redeem a part of the property embraced by the lien. The very least that can be said is that he can stand, with respect to redemption, in no better situation than did the Toledo, Wabash & Western Railway Company. If that company, as a principal obligor, had a right, as their mortgaged debts matured, to pay them off, that right terminated when the pay day passed, and nothing remained but an equitable right to be

relieved from the forfeiture by resort to the equitable right of redemption. But payment would have extinguished the debts and the mortgage, and he does not propose to pay off these mortgage debts. He wishes, on the contrary, to redeem and keep them alive for his own benefit, and will seek, in turn, to be redeemed by subsequent lienors. His extreme right is to exercise the right of redemption which the Toledo, Wabash & Western Railway Company might do if it were seeking redemption. That right, in its most favorable statement for him, was to pay and extinguish these mortgages on the pay day, or, in default, pray to have accorded him that equity of redemption which, under the facts, might be exercised by the Toledo, Wabash & Western. There is nothing in the Ohio consolidating statute which indicates any purpose to in any way impair or affect any right, in law or equity, which any creditor of a constituent company had. Upon the contrary, the act expressly provides "that all rights of creditors, and all liens upon the property of either of said corporations, shall be preserved unimpaired, and the respective corporations may be deemed to be in existence to preserve the same." But it is said that the mortgagees are not the same, and that this doctrine has, therefore, no application. The trustee in each of the two first mortgages was the same corporation, and the trustee in the two second mortgages was the same person. What is meant by this objection is that the present holders of the bonds are not, or may not be, the same persons, and that the doctrine applies only where the beneficiaries in the consolidated mortgages are the same persons. That the beneficiaries are not the same persons under each mortgage is an assumption. The only information which the court has about the subject is that the bonds secured by each mortgage were made payable to the mortgagee named therein, or bearer, and that S. Fisher, Edmond Pepper, and J. H. Purdy were made defendants, "as a committee representing certain holders of first mortgage bonds of the Toledo & Illinois Railway Company, and Lake Erie, Wabash & St. Louis Railroad Company," these being the original mortgagor companies. But it seems to me that it is not essential to the application of this doctrine that the beneficiaries under such mortgages as these—mortgages intended to secure negotiable bonds—should be identically the same persons. Such mortgages are in many respects peculiar, and are quite modern in development. The legal title is in the trustee. He alone can sue and be sued in a court of law. He must perform all the duties of the holder of a legal estate, and is bound to protect, defend, and enforce the trust. His negligence or laches affects the beneficiary. He may enforce the trust without the presence of any beneficiary. So a bill to redeem will lie against the trustee alone, or he may redeem a senior lien on his own suit. It seems to me that, under such peculiar trusts, the union of the securities in the same trustee gives operation to the equity arising from consolidation. If this be not so, then the doctrine can never be applicable to such mortgagees, for the beneficiaries are never likely to be the same persons on any two days of the life of the bonds.

6. Another objection to separate redemption, applicable if the court has any discretion, lies in the injurious consequences resulting from the unnecessary severing of a line of railway. The property on which he has a lien is a railroad lying partly in two states. From its construction, in 1852, by two independent companies, it has been managed and operated as a unit, and since 1858 has been owned as one property, and run by one corporation. If it cannot be owned, held, and operated as an entirety, it will manifestly be most disastrous to all persons concerned. As observed in Muller v. Dows, 94 U. S. 449, "a part of a railroad may be of little value when its ownership is severed from the ownership of another part, and the franchise is incapable of division." It has been the settled policy of courts to treat a railroad as an entirety, and to prevent its severance, even though subject to partial mortgages. Muller v. Dows, 94 U. S. 449; Union Trust Co. v. Illinois M. R. Co., 117 U. S. 466, 6 Sup. Ct. 809; Bank v. Shedd, 121 U. S. 87, 7 Sup. Ct. 807. No court has expressed more decided views on this subject than the supreme court of Ohio. Railroad Co. v. Lewton, 20 Ohio St. 401. In Columbia Finance & Trust Co. v. Kentucky Union Ry. Co., 9 C. C. A. 265, 60 Fed. 794, this court held that a railroad was not subject to redemption after foreclosure sale under a statute of Kentucky which provided that all real estate sold under any order or judgment of a court should be appraised, and subject to redemption after the sale if sold for less than two-thirds of its appraised value. This decision was in accord with that of Hammock v. Trust Co., 105 U. S. 77, and both proceeded upon the idea that a railroad was an entire thing, incapable of severance without great destruction in its value, which consisted, in a large degree, in its maintenance as a unit. To allow the separate redemption of the Ohio part of the line is to sever ownership and management, and destroy the unity of the line. It is idle to say that this will not affect the holders of the Indiana mortgage debts. A road thus severed into two independent portions may be of little value to the owners of either. The state of Ohio encouraged the consolidation of connecting lines by very liberal statutory provisions. The same statute the Ohio court has construed as conferring a unit lien on the whole of said road, in favor of Compton. Now, should that statute be construed so as to permit Compton to ignore the unit character of his lien, and thus bring about a severance of the roads which were united by the same act which conferred the lien? Under such a lien, upon property of the description of that involved, the lienor should be held to an entire redemption of all the property on which his lien rests.

7. But it may finally be said that the same act of consolidation which gave rise to the lien asserted by Compton gave to the Indiana divisional bondholders a similar lien on the entire property of the Toledo & Wabash Railway Company which had been transferred by the consolidation to the Toledo, Wabash & Western Railway Company, and that, therefore, they have the right to object to any redemption which does not provide for their payment, or does not admit them to a participation in the benefits of the lien. This has not been answered, except by an insistence that the purchaser

cannot on this appeal represent those bondholders, and is not the equitable assignee of the rights of the Indiana bondholders by virtue of the Ohio decree of foreclosure; and by the further suggestion that, if the Indiana mortgagees were parties at all to the Ohio foreclosure suit, they are estopped to set up any such lien, having neglected to assert it in the foreclosure case. It is a mistake to say that the Indiana mortgagees were not parties to this cause. The amended and supplemental bill filed by Jesup and Knox set out each of the four prior mortgages, and made the trustees parties thereto, "in order that a decree might be made herein settling the rights and equities of the said several classes of bondholders, and ordering a sale of said property and equipments free and clear of all liens of said underlying mortgages." The property covered by the Knox and Jesup mortgage included the entire line in the three states of Ohio, Indiana, and Illinois; and the sale sought was a unit sale of the entire line, and such was the final decree of foreclosure. Like bills were filed in each jurisdiction, and the Ohio decree is identical with the Indiana decree. That bill also made S. Fisher, Edmond Pepper, and J. H. Purdy defendants, "as a committee representing certain holders of first mortgage bonds of the Toledo & Illinois Railway Company and Lake Erie, Wabash & St. Louis Railroad Company," these being the original mortgagor companies. The cross bill of Humphreys and Lindley, trustees under a blanket mortgage subsequent to that of Jesup and Knox, likewise made the Farmers' Loan & Trust Company and James F. Joy, as trustees under both the Ohio and Indiana mortgages, defendants. It is true that neither of the trustees under the Indiana mortgages filed original or cross bills praying foreclosure of the Indiana mortgage by the Ohio court. That is immaterial, for the other complainants and cross complainants did bring them before the court, in their character as trustees under both sets of mortgages, and did obtain a decree foreclosing both the Indiana and Ohio mortgages, as well as every other mortgage on the entire line, extending through three states. That decree of the circuit court of the United States for the Northern district of Ohio was executed, and the entire line of railroad then owned by the Wabash, St. Louis & Pacific Railway Company was sold as a unit, and the commissioner directed to make a conveyance accordingly. It is said that this Ohio decree, selling the road as a unit, is valid only to the extent of the property within the jurisdiction. In other words, the insistence is that the decree of foreclosure, although confirmed by being subsequently entered within every other jurisdiction, was valid in each only so far as the mortgaged property was within the jurisdiction. Having thus divided and distributed the decree, it is said that it must follow that the purchaser's title involved on this appeal is the title which he obtained under the Ohio decree to the Ohio Division, and nothing in this controversy involves its title to the Indiana bonds, as equitable assignee. If this be so, with all of its inferences, it would seem that the court had been engaged in a wholly fictitious controversy. How is the court to determine the extent to which Compton must redeem, if that is his only remedy, unless the parties interested in that question are before the court

in propria persona, or by representation? The Wabash Railway Company was not the purchaser at foreclosure sale, but is the assignee of the purchasers. It was regularly admitted, on its own application, as a defendant, with leave "to take advantage of, and use as its own, all the allegations in the original, amended, or supplemental pleadings of complainants filed in this cause, or in the pleadings of the Farmers' Loan & Trust Company and James F. Joy, relating to or bearing on the claims of said Compton." Thus, it is before the court, not by reason alone of its attitude as assignee of the purchasers, but as a full and formal party, admitted for the express purpose of contesting the relief sought by Compton. It is true that he sought for a sale of the Ohio Division only, and had no prayer for redemption, entire or partial. The court, however, construed its power, under the saving clause in the decree of foreclosure, as reserving jurisdiction over him and his lien, so that it might give him such relief as he should show himself equitably entitled to. His prayer for general relief has also been construed as including redemption, and to this I agree. Being a formal defendant, the Wabash Railway Company may rely upon any defense which goes to Compton's right to a separate redemption. As the owner of the Indiana Division under an imperfect foreclosure, only because Compton's lien is unforeclosed, it is the equitable assignee of the Indiana mortgage debts. Whether it became so under the Ohio decree, or under the Indiana foreclosure only, is absolutely immaterial. If, for any of the reasons which I have before stated, Compton should not be accorded separate redemption of the Ohio mortgages, it, as the owner of the Indiana Division under such defective foreclosure, and of the Indiana bonds, as a consequence, is entitled to resist a partial redemption, both as successor to the successive mortgagor corporations, and equitable assignee of the Indiana bonds. But I utterly dissent from the conclusion of Judge TAFT that the foreclosure sale was in form a unit sale, but in fact a sale by fragments. The bids on separate divisions were never accepted, and the bid reported and confirmed was one for the line as an entirety. By what authority were the fragmentary bids rejected, and the bid for the property as a unit accepted, if the decree of sale was invalid, except so far as the property was within the territorial jurisdiction of the Ohio court? If that theory be sound, there has been no sale at all of any part of the road. On that theory, what has become of the franchise? That was a unit, incapable of being split up and distributed among the fragments. Who has obtained the rolling stock and personal property,—the purchaser of the Indiana Division, or the purchaser of the Ohio Division? Under which decree did it pass? Or if it, too, was transferred in fragments, on what basis was the division made? The doctrine of Muller v. Dows, 94 U. S. 444–449, lends no support to the idea of distributing the decree of sale. The Ohio court had before it the mortgagor corporations, or those who had succeeded to their title and rights of redemption, as well as every trustee under both divisional and blanket mortgages. It could have required all the parties to join in a conveyance of the entire line, and thus confirm its decree for a unit sale; and this would, confessedly, have

passed the entire title, though the suit had been filed in a single jurisdiction. A modern method of accomplishing the same end has grown into favor, and that is to have identical decrees entered in each jurisdiction. The legal effect of this is to confirm the decree ordering the sale of the line within each jurisdiction as one entire line. The result of such confirmation is to make a unit instead of a fragmentary sale, and the title of the purchaser to the whole property is complete under each identical decree. The same end is reached that would have resulted from a decree requiring a deed from all having any interest in any part of the line. This method of selling a railroad lying within two or more states obviates many of the objections to the plan adopted in Muller v. Dows, and makes it possible to make a unit sale where either the mortgagor or some trustee has not personally appeared, and could not be required to make a deed. It is believed to be a plan now generally adopted, the operativeness of which I have never before heard questioned.

It is next said that the Indiana mortgagees have waived the benefit of the Ohio statutory lien on the Ohio Division by failing to set it up in the foreclosure cases. By this must be meant that this additional security was not asserted in the original pleadings, for its assertion now is an assertion of the claim in the foreclosure proceedings, so soon as it became material to claim the benefit of it. The question as to the existence of any such lien had been decided adversely to the lienors by the supreme court of the United States in the case of Railway Co. v. Ham, reported in 114 U. S. 587, 5 Sup. Ct. 1081, and decided in 1885. That was supposed to be a class suit, and to be conclusive upon all who might have asserted such a lien. The foreclosure proceedings were begun in February, 1887. During the pendency of these suits the Ohio supreme court decided the Compton Case, and refused to follow the Ham decision in the construction of the Ohio statute. This decision was made in 1888. Subsequently, Compton was made a defendant, as a person claiming some interest or lien upon the property sought to be sold free from all incumbrance. He had not answered or filed any pleadings when the foreclosure decree was made, and a sale ordered reserving his rights. When he did plead, and asserted this lien, it was found not to be a lien exclusively for his benefit, but one which inured to the equal benefit of all who are unpaid creditors of the Toledo & Wabash Railway Company. Though he sought to avail himself of it for his exclusive benefit, yet this court is agreed in holding that the lien must inure in behalf of all within the benefits of the statute. The contention that the Indiana bondholders are entitled to share in the benefits of this lien and of Compton's redemption is presented, not in a new or subsequent suit, nor in a collateral proceeding, but in the very suit in which the existence of a class lien is declared, and a remedy for its enforcement is to be awarded. When the circuit court refrained from deciding any question involved in Compton's assertion of this lien, and reserved jurisdiction to thereafter adjudge his rights in their relation to all the other parties to the proceeding, it necessarily operated as a reservation of the rights of all others who were defendants, who might have

an interest under the class lien asserted by him. If, when the foreclosure sale had been made, it had appeared that in the pro rata of the unit price assignable to the Indiana Division there was a deficiency in the fund applicable to the Indiana divisional bonds, and an excess in the fund assignable to the Ohio Division, after paying the Ohio bonds, the question would have arisen as to the rights of the unpaid Indiana mortgagees in this excess. No such excess appeared, and no such question was therefore material. But if the Ohio Division is to be separately redeemed by Compton, for the benefit of all entitled to share therein, the question of who are the beneficiaries under the lien does become relevant. No redemption, entire or partial, can be had that does not involve—First, an adjudication that the foreclosure was defective, and the purchaser's title subject to redemption; second, a determination of the rank and rights of the statutory lienors in relation to the rank and rights of mortgagees, both junior and senior, to the lien under which redemption is to be had; and, finally, an ascertainment of the beneficiaries under the redemption. Now, if the purchaser's title is defective, it is entitled to stand as the equitable assignee of the debts secured under the mortgages foreclosed, as well as of the security for those debts. If Compton succeeds in establishing that the Indiana bonds have a double security, the second being a result of the successful assertion of a lien upon the Ohio Division subordinate only to the Ohio divisional mortgages, then the equitable assignee of the Indiana bonds is entitled to the benefit of this second security. It may be accountable to the mortgagees for all it shall realize after reimbursing its own expenditure, but that is a matter which does not concern Compton. In any view of the case, I am clearly of opinion that, if Compton is accorded a separate redemption of the Ohio property, it must inure to the equal benefit of the unpaid second Indiana mortgagees.

8. If I am right in regarding Compton's remedy as redemption, and that in determining what he shall redeem the remedy accorded him by the Ohio court cuts no figure, then I think it must follow that the Indiana decree, disallowing separate redemption, and requiring him to redeem all or none, is a conclusive adjudication of the question, and may be relied upon to sustain the motion to dismiss or affirm. The parties and the subject-matter were the same. That court had jurisdiction over both, through the power reserved by the Indiana decree over Compton and the purchaser. If this court, reviewing the decree of the circuit court for the Northern district of Ohio, has the authority to consider the question involved in the insistence for an entire redemption, then the Indiana circuit court could, under like pleadings, and a like reservation of jurisdiction over Compton's lien, grant him proper equitable relief. This failure to appeal from the decree requiring him to redeem all or none is conclusive as an estoppel.

Finally, I think that whether Compton redeems the entire road covered by his lien, or a part thereof, the purchaser is not subject to an accounting for rents and profits. The liability to an account depends upon whether the purchaser was in possession as first mort-

gagee. "In order," says Mr. Pomeroy, "that these special rights and liabilities may arise from his possession, it must be a possession taken and held by him as mortgagee." Pom. Eq. Jur. § 1215; Jones, Mortg. §§ 1114–1121. The liability for an accounting is only to the mortgagor, or a subsequent mortgagee; and it proceeds upon the theory that the possession was as trustee for the mortgagor, and therefore accountable for rents in equity. Pom. Eq. Jur. § 1218; Jones, Mortg. § 1115. The mortgagor in possession is therefore not accountable while suffered to remain in possession by a mortgagee. Neither would a mortgagee who entered under a purchase of the mortgagor's equity of redemption be accountable to a junior mortgagee. Gray v. Nelson, 77 Iowa, 63, 41 N. W. 566. Nor could a senior mortgagee call a junior mortgagee to an accounting, for he has no right to redeem the junior incumbrancer, and therefore no right to hold him to an accounting. A junior mortgagee in possession would be responsible alone to the mortgagor, or to a lienor junior in rank. Jones, Mortg. § 1116. If, therefore, the purchaser's possession was as purchaser or assignee of the mortgagor, or as a junior incumbrancer, it is not liable to an accounting to Compton. In fact, its possession was under a judicial foreclosure which operated to bar and foreclose mortgages both junior and senior to the lien of Compton, and to forever bar the mortgagor's equity of redemption. That decree was not void, for it expressly foreclosed all those rights, titles, and equities, subject to the lien of Compton, if any he had. Where the purchaser's title and possession depend on a void decree, they have been held to operate as an assignment of the mortgage sought to be foreclosed; and in such case the purchaser's possession is that of a mortgagee by assignment, in possession, and accountable to one entitled to redeem. Id. § 1118. Most of the cases in which a senior mortgagee has been held liable to an accounting have either been because possession was taken before foreclosure, or where the mortgagor had not been barred. If the purchaser in possession has failed to obtain the mortgagor's title, for any reason, he is liable to account to the mortgagor, when he seeks redemption, or to a junior incumbrancer. All that is said in Russell v. Southard, 12 How. 153, concerned an accounting to the mortgagor, and a redemption by him. The purchaser's title is perfect, save in so far as Compton's lien is to be regarded as unforeclosed. Holding such a title, it cannot be said that the foreclosure sale operated only as an assignment of the mortgages foreclosed. Its effect was to confer an absolute legal title, subject to an intermediate lien, the place of which was to be determined with regard to its relation to other lienors. Jones, Mortg. § 1395. The cases of Catterlin v. Armstrong, 79 Ind. 514, and Renard v. Brown, 7 Neb. 449, are upon the very point now considered. The reasoning is sound, and entirely meets my approval. The decree on this point should be affirmed, as well as in all other respects, save only as so modified as to hold that Compton's redemption must inure to the benefit of all other creditors of the same class.